United States, Appellee

v.

Michael G. NEW, Specialist
U.S. Army, Appellant

No. 99-0640

Crim. App. No. 9600263

United States Court of Appeals for the Armed Forces

Argued February 4, 2000

Decided June 13, 2001

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE and EFFRON, JJ., joined.  EFFRON, J., filed a concurring opinion.  SULLIVAN, J., filed an opinion concurring in the result.  EVERETT, S.J., filed an opinion concurring in part and in the result.


Counsel

For Appellant:  Henry L. Hamilton (argued); Major Norman R. Zamboni (USAR) and Captain Blair T. O'Connor (on brief).

For Appellee:  Captain Kelly D. Haywood (argued); Colonel Russell S. Estey, Lieutenant Colonel Eugene R. Milhizer, and Major Patricia A. Ham (on brief).

Military Judge:  W. Gary Jewell


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

United States v. New, No. 99-0640/AR

Chief Judge CRAWFORD delivered the opinion of the Court.

INDEX

FACTS                                                          3

DISCUSSION

    I.    Denial of a Challenge for Cause                    5

    II.   Consideration of the Legality of an Order
         as a Question of Law                           10

    III. Legality of the Order                            27

    IV.   Application of the Political -
         Question Doctrine                              33

Contrary to his pleas, appellant was convicted by a special court-martial consisting of officer and enlisted members of failure to obey an order to wear his U.S. Army uniform modified with United Nations (UN) accoutrements, in violation of Article 92(2), Uniform Code of Military Justice, 10 USC § 892(2). Appellant's sentence to a bad-conduct discharge was approved by the convening authority. The Court of Criminal Appeals affirmed the findings and sentence. 50 MJ 729 (1999). We granted review of the following issues:

    I.  WHETHER THE MILITARY JUDGE ERRED BY DENYING APPELLANT'S CAUSAL CHALLENGE AGAINST A COURT-MARTIAL MEMBER WHO PREVIOUSLY ORDERED A SUBORDINATE TO DEPLOY TO MACEDONIA.

    II.  WHETHER APPELLANT'S CONSTITUTIONAL AND STATUTORY RIGHTS TO BE TRIED BY COURT-MARTIAL MEMBERS AND TO HAVE THE MEMBERS DETERMINE WHETHER THE GOVERNMENT HAS PROVED EVERY ESSENTIAL ELEMENT OF THE CHARGED OFFENSE BEYOND A REASONABLE DOUBT WERE VIOLATED BECAUSE THE MILITARY JUDGE RULED THAT THE ORDER GIVEN TO APPELLANT WAS LAWFUL WITHOUT SUBMITTING THE ISSUE TO THE MEMBERS, AND BECAUSE THE

MILITARY JUDGE INSTRUCTED THE MEMBERS THAT THE ORDER WAS LAWFUL AS A MATTER OF LAW.

III. WHETHER THE MILITARY JUDGE ERRED BY FINDING THAT THE ORDER TO DEPLOY IN THE UNITED NATIONS UNIFORM WAS LAWFUL.

IV. WHETHER THE MILITARY JUDGE ERRED BY AVOIDING THE QUESTION OF THE LAWFULNESS OF THE ORDER AND HOLDING THAT LAWFULNESS WAS A NONJUSTICIABLE POLITICAL QUESTION.

For the reasons set forth below, we affirm the decision of the Court of Criminal Appeals.

FACTS

In 1992, the UN established a Protective Force (UNPROFOR) in the Former Yugoslavian Republic of Macedonia (FYROM). The United States contributed troops to this force in 1993 and, in 1995, this force was redesignated as the UN Preventive Deployment Force (UNPREDEP).

In August of 1995, 1st Battalion, 15th Infantry Regiment, 3d Infantry Division (1/15 Infantry) was ordered to assume the FYROM UNPREDEP mission as of November 1, 1995. Appellant, a medic, was attached to a squad of Company A, 1/15 Infantry. Appellant expressed concern about wearing the UN accoutrements on his U.S. uniform. 50 MJ at 733-34. Specifically, uniform modifications included in part the UN blue beret and field cap, a UN blue shoulder patch, blue scarf, and UN badge and identification card to be issued in the FYROM. Id. at 734 n.7. On August 23, 1995, appellant was ordered to do research on the history and objectives of the UN and submitted a written

3

statement of his position at the suggestion of his command.  He stated that he could not assess the legality of the order to wear the modified uniform because he did not "understand the legal basis" of the order.

Appellant's concerns were discussed by his father on the Internet and were reported in the popular media and noted by several members of Congress.  Appellant's noncommissioned officer leadership, company commander, and battalion commander each spoke with him to alleviate his doubts about the legality of the UNPREDEP mission and the uniform modification.  Appellant did not inform anyone in his chain of command that he believed that the UN accoutrements conflicted with Army Regulation (AR) 670-1, Wear and Appearance of Army Uniforms and Insignia (1 September 1992).

Prior to deployment, the unit was granted leave and appellant visited Washington, D.C.  In Washington, he met with his future counsel and with several legislators who were concerned about the legality of the UNPREDEP mission and about President Clinton's representations to Congress.

On October 2, 1995, the unit was briefed by the battalion commander on the legality of the FYROM UNPREDEP mission, but not on specific battle dress uniform (BDU) modifications.  The unit was ordered to wear the modified uniform starting on October 10. 50 MJ at 734.  Appellant's company commander, Captain (CPT)

4

Palmateer, reissued these orders at a company formation. Appellant turned in the required two sets of BDUs to be altered.

At the next formation, appellant reported in unaltered BDUs and was removed from the formation. Two hours later, he was given a "second chance" to comply with the order by Lieutenant Colonel (LTC) Layfield and refused. Appellant was then declared non-deployable. 50 MJ at 735. The order and his responses formed the basis for the charge of disobedience that is the subject of the present appeal.

## DISCUSSION

### ISSUE I – DENIAL OF A CHALLENGE FOR CAUSE

During individual voir dire, a court-member, Colonel (COL) Dana F. Kwist, was asked whether he had "sent people to operations where they had to wear the blue beret." He responded as follows to questions by one of his civilian defense counsel (CDC2):

> COL KWIST: I have a captain in Macedonia that's the headquarters commandant down there. I'm not certain if they're wearing it in Northern Iraq, but I have a captain that's attached down there, as well.
>
> CDC2: Okay. And did you—what, if any, opinion do you have about wearing that blue beret, as you sent two soldiers to do?
>
> COL KWIST: Well, I don't know that I've ever formed an opinion. I don't really think about it.
>
> CDC2: Do you think about it?
>
> COL KWIST: No, I don't.

5

> CDC2: Well, I mean, do you—you obviously sent two of your subordinates to do that, and the gist of this order—you've read the flyer there—is that somebody disobeyed that. Doesn't that put them at odds, basically, with a decision that you've already made concerning the very same matter?
>
> COL KWIST: I just don't think about it like that. This comes down as a tasking from our corps headquarters, and I fill squares based on the taskings. No, I don't get into that conversation or—at all.

Following voir dire, the defense challenged COL Kwist for cause partly "because he has a captain . . . in Macedonia on the very mission that this pertains to."[1] In response, trial counsel argued:

> And, as to his soldiers, he's merely doing what he's required to do, and that is receiving an order, executing it, and transmitting it. There is no indication that any of those soldiers raised the issues that the accused raised to him. He wasn't confronted with this issue in sending his soldiers on these deployments. Soldiers obey orders. That's the general rule. And every one of these members of the panel obeys orders, and if they obey an order, that's not a basis for them now to be challenged just because what's at issue in this case is disobeying an order.

The military judge denied this causal challenge, stating that he adopted trial counsel's argument.

Appellant asserts that COL Kwist demonstrated actual and implied bias because he had a personal and professional interest in the result of appellant's trial inasmuch as the challenged member gave precisely the same order as appellant was accused of

---

[1] Appellant also challenged COL Kwist because he read newspaper articles concerning this case. The granted issue, however, only addresses that part of appellant's objection concerning COL Kwist's having ordered a subordinate to deploy to Macedonia. Hence, our review is limited by the granted issue.

disobeying.  The Government argues that the defense failed to demonstrate any actual bias by COL Kwist and that appellant waived any claim of implied bias by failing to challenge COL Kwist on that basis at trial.

As we noted in United States v. Ai, 49 MJ 1, 4 (1998), a servicemember has a "right to impartial court-members to decide his guilt."  We have also noted that RCM 912(f)(1)(N), Manual for Courts-Martial, United States (1995 ed.), codifies a general ground for challenge" which includes both actual and implied bias.  United States v. Minyard, 46 MJ 229, 231 (1997).[2]  The Rule's discussion notes examples of grounds for challenge as including, "a direct personal interest in the result of the trial."  Further, RCM 912(f)(3) provides: "The burden of establishing that grounds for a challenge exist is upon the party making the challenge."

First, we turn to the question whether appellant established actual bias.  "The test for actual bias [in each case] is whether any bias is such that it will not yield to the evidence presented and the judge's instructions."  United States v. Warden, 51 MJ 78, 81 (1999)(internal quotation marks omitted).

---

[2]  RCM 912(f)(1)(N) states that a member should be excused when it appears that the person "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."

COL Kwist's testimony during individual voir dire gave no indication that he would be unable to "yield to the evidence presented and the judge's instructions." When asked whether someone who refused to wear the blue beret would be at odds with him because he had ordered two of his soldiers to deploy to areas potentially requiring them to wear blue berets, he responded: "I just don't think about it like that. This comes down as a tasking from our corps headquarters, and I fill squares based on the taskings. No, I don't get into that conversation or—at all." Moreover, COL Kwist indicated during group voir dire conducted by the military judge that he would base his decision on the evidence presented and the judge's instructions.

"Actual bias is a question of fact" which "is reviewed subjectively, through the eyes of the military judge of the court members." Warden, 51 MJ at 81 (internal quotation marks omitted). The evaluation of the potential member's mental state is most important:

> Where. . .the totality of the circumstances indicate
> . . . that a member is genuinely open to considering all
> mitigating and extenuating factors which are relevant to
> a just sentence before arriving at a fixed conclusion, a
> military judge has broad discretion to grant or deny
> challenges.

United States v. Rockwood, 52 MJ 98, 106 (1999)(emphasis in original). Applying this standard, we hold that the military

judge did not err in denying the challenge for cause on the basis of actual bias.

Next, we turn to the question of whether appellant established implied bias. "[I]mplied bias is viewed through the eyes of the public," and "[t]he focus is on the perception or appearance of fairness of the military justice system." Warden, 51 MJ at 81 (internal quotation marks omitted).

Appellant argues that COL Kwist would be biased in that he would "lose face" unless appellant were convicted because the legitimacy of his own order would be questioned. COL Kwist's testimony reveals a position quite contrary to appellant's assertion. He indicated that because of the lack of controversy, he did not view the matter personally but rather as merely "fill[ing] squares based on the taskings" from "corps headquarters." As a practical matter, all officers who sit on courts-martial have given or received orders of all kinds as a standard part of military life. It is unlikely that the public would view all officers or all enlisted personnel who have ever given an order as being disqualified from cases involving disobedience of orders that are similar to any they may have given in the past. Such a standard would make it virtually impossible to find members to sit on cases involving disobedience of orders.

Although "[w]e give the military judge less deference on questions of implied bias," we hold that there was no error under these facts.  Warden, 51 MJ at 81, citing United States v. Youngblood, 47 MJ 338, 341 (1997).

ISSUE II – CONSIDERATION OF THE LEGALITY OF AN ORDER AS A
QUESTION OF LAW

This case involves some of the most difficult choices that may confront our Government and our men and women in uniform. Faced with increasing instability in the Balkans, the United States had to decide whether to deploy U.S. troops in support of the peacekeeping effort in the former Yugoslavian Republic of Macedonia, how to structure command and control relationships with other national and international forces in the area, what types of orders were needed to implement those relationships, and how to dispose of alleged violations of such orders. Appellant had to decide whether he should voice his opposition to those decisions, how to do so, and whether to obey orders that he viewed as unlawful.

Appellant chose to manifest his opposition through disobedience of an order from his commander, and he challenged the legality of that order at his court-martial.  He now asks this Court to create an exception to the requirement that the military judge decides questions of law where, as in this case, appellant claims the question of law is an element of the alleged offense.  So framed, the issue requires us to make a

10

choice and decide whether lawfulness of the order was a legal question for the military judge or an element that should have been submitted to the members.  There are respectable arguments on both sides of the question.

This Court reviews the question of whether the military judge correctly determined that the issue was a question of law on a de novo standard of review.  For the reasons set forth below, we hold that lawfulness of an order, although an important issue, is not a discrete element of an offense under Article 92.  We further hold that, in this case, the military judge properly decided the issue of lawfulness as a question of law.  See Art. 51(b), UCMJ, 10 USC § 851(b).

Military personnel are obligated to obey lawful orders and regulations.  Arts. 90, 91, and 92, UCMJ, 10 USC §§ 890, 891, and 892, respectively.  The term "lawful" recognizes the right to challenge the validity of a regulation or order with respect to a superior source of law.

A "regulation" is an "authoritative rule or principle . . . ."  The term includes "a rule or order having the force of law issued by an executive authority of a government usu[ally] under power granted by a constitution or delegated by legislation. . . ."  Webster's Third New International Dictionary 1913 (1981).  An "order" means a "rule or regulation made by competent authority;" "an authoritative mandate

usu[ally] from a superior to a subordinate;" and "a written or oral directive from a senior military or naval officer to a junior telling him what to do but giving him certain freedom of action in complying." Id. at 1588 (emphasis added).

The role of what is now the military judge (MJ) in ruling on questions of law was discussed during the 1949 House hearings that preceded enactment of the UCMJ. During the hearings, Congressman DeGraffenried asked whether a ruling by a law officer (now MJ) on a question of law would be binding on the court members. Mr. Larkin, a Department of Defense witness, see 33 MJ LXI, responded:

> It is absolutely binding, except for the fact of course that any member of the court whether he is a lawyer or otherwise may for his own personal reason not follow them, which is a situation that obtains in any court in the land. The judge may rule on the questions of law and he may instruct the jury and charge them and as it happens the jury goes out and pays no attention to them whatever. But that is something over which no one has any control in any tribunal.
>
> Mr. DeGraffenried. He acts as the judge on questions of law?
>
> Mr. Larkin. That is right. He acts as an outright judge on questions of law and his rulings are final and binding. Whether any individual person decides that he doesn't want to follow them or not of course is a different problem.

Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm. (hereafter Hearings), 81st Cong., 1st Sess. 1154 (1949).

As a result of these and other hearings, the Code was passed by Congress. By statute, "[t]he military judge . . . shall rule upon all questions of law and all interlocutory questions arising during the proceedings." Art. 51(b), UCMJ, 10 USC § 851(b). The Manual for Courts-Martial provides that the military judge shall, "[s]ubject to subsection (e) of this rule [regarding finality of rulings], rule on all interlocutory questions and all questions of law raised during the court-martial." RCM 801(a)(4).

In United States v. Carson, 15 USCMA 407, 408, 35 CMR 379, 380 (1965), our Court noted in dicta that the legality of an order in a disobedience case is an issue of law, as follows:

> Whether an act comports with law, that is, whether it is legal or illegal, is a question of law, not an issue of fact for determination by the triers of fact. For example, in a prosecution for disobedience of an order, in violation of Article 92, Code, supra, 10 USC § 892, the court-martial must determine whether the order was given to the accused, but it may not consider whether the order was legal or illegal in relation to a constitutional or statutory right of the accused.

Paragraph 57b, Manual for Courts-Martial, United States, 1969 (Revised edition), expressly treated the legality of an order in a disobedience case as a question of law to be decided by the military judge. See U.S. Dep't of the Army, Pam. No. 27-2, Analysis of Contents, Manual for Courts-Martial, United States, 1969, Revised Edition (1970), at 10-5 (citing Carson). The

provisions of the 1969 Manual have been carried forward in this

Discussion accompanying RCM 801(e)(5) in the current Manual:

> Questions of law and interlocutory questions
> include all issues which arise during trial other than
> the findings (that is, guilty or not guilty), sentence,
> and administrative matters such as declaring recesses
> and adjournments.  A question may be both interlocutory
> and a question of law. . . .
>
> Questions of the applicability of a rule of law to
> an undisputed set of facts are normally questions of
> law.  <u>Similarly, the legality of an act is normally a
> question of law.  For example, the legality of an order
> when disobedience of an order is charged</u>, the legality
> of restraint when there is a prosecution for breach of
> arrest, or the sufficiency of warnings before
> interrogation are normally questions of law.  It is
> possible, however, for such questions to be decided
> solely upon some factual issue, in which case they would
> be questions of fact. . . .

(Emphasis added.)  <u>See</u> Art. 51(b)(the rulings of a military

judge are final on "all questions of law," as well as "all

interlocutory questions," except for "the factual issue of

mental responsibility").  See RCM 801(a)(4); RCM 801(e)(1);

RCM 801(e)(4) Discussion; <u>cf</u>. RCM 801(e)(2)(B)(in contrast to

the rulings of the military judge, the rulings of the president

of a special court-martial without a military judge are not

final with respect to interlocutory questions of fact).  <u>See</u>

<u>also</u> RCM 801(e)(5) Discussion.

Judge Sullivan concludes that the issue of lawfulness in

this case was an element that the military judge had to submit

to the members.  We have several significant points of

disagreement with that conclusion and with several points raised by his separate opinion.

First, although he asserts that his approach represents a "modern military legal practice," ___ MJ at (3), this Court has never held that "lawfulness" is an element that must be submitted to the members. At most, the cases cited in his separate opinion reflect isolated dicta or descriptions of circumstances in which predicate factual issues were submitted to the members. None of the cases cited by the separate opinion presented an issue in which this Court was required to determine the relative responsibilities of the military judge and the members with respect to deciding lawfulness of an order. In fact, before the Supreme Court's 1995 decision in Gaudin, we were not compelled to choose in a case such as this between treating lawfulness as an issue of law for the military judge or an element for the members. Prior to Gaudin, the Supreme Court had permitted trial judges to resolve certain legal issues without determining whether the Sixth Amendment required such issues to be submitted to a jury as an element. See, e.g., Sinclair v. United States, 279 U.S. 263 (1929). As we consider the issue whether lawfulness is an element of the offense of disobedience under Article 92, we note that the ambiguities in the Benchbook, lower court opinions, and dicta in our prior decisions reflect the pre-Gaudin era in which it was not

15

necessary to resolve that issue.  The case before us represents the first time, subsequent to Gaudin, that we must answer the question whether lawfulness is an element that must be submitted to the members.

Second, we do not agree that Unger v. Ziemniak, 27 MJ 349 (CMA 1989), controls the present case.  As the separate opinion notes, Unger contains language suggesting that "[i]n a prosecution for disobedience, lawfulness of the command is an element of the offense."  Id. at 358.  There are critical differences, however, between Unger and the present case.  The issue presented to our Court in Unger did not involve a dispute as to whether lawfulness is a discrete element, nor did the case require us to determine the appropriate division of responsibilities between the military judge and the members in a disobedience case.

Unger involved a pure question of law.  Unger had submitted pretrial motions seeking dismissal of charges on the ground that the order for her to submit to a urinalysis examination was illegal as a matter of law.  The military judge rejected the motions, and Unger sought appellate review through a request for extraordinary relief, which the court below denied.  We in turn affirmed that decision.  See 27 MJ at 350, 359.  After concluding that the military judge correctly rejected the motions to dismiss the charges, the opinion in Unger ventured

16

beyond the issue on appeal and suggested how the issue might be addressed "if" there was a trial, indicating that lawfulness was an element to be decided by the members.  The Unger opinion did not discuss Carson and provided only the most cursory rationale for the suggestion that lawfulness was an element to be decided by the members.  Viewed in that context, the language in Unger does not carry the weight that we would accord a decision directly addressing a controversy briefed by the parties.  That aspect of Unger has not been followed, and there is nothing in the opinion which persuades us that we should reject the longstanding approach of the Manual.

Third, we disagree with the separate opinion's suggestion that lawfulness of an order must be treated as an element of a disobedience offense as a matter of constitutional law.  __ MJ (9).  The Supreme Court has made clear that in a prosecution for violation of an order or regulation, the Constitution does not require that the validity of the order or regulation be decided by a jury.  For example, in Cox v. United States, 332 U.S. 442 (1947), both the plurality (id. at 452-53) and the dissent (id. at 455) agreed that the validity of the regulation was an issue of law.  (Douglas and Black, JJ., dissenting), but agreeing with the plurality that the issue of validity was a question "of law").  See generally Yakus v. United States,

17

321 U.S. 414, 433, 444-48 (1944)(Congress may require challenges to the validity of a regulation governing wartime price controls to be made in the context of a civil proceeding, thereby precluding a defendant from asking the judge, as well as the jury, to rule on the validity of the regulation in a criminal prosecution for violation of the regulation).

Fourth, we do not agree with the separate opinion's reliance on Winthrop's classic treatise, W. Military Law and Precedents (2d ed. 1920 Reprint), for the proposition that lawfulness is an element that must be submitted to a "military jury." ___ MJ at (9). Courts-martial in Winthrop's day did not simply function as a civilian "jury"; they consisted solely of members -- there was no equivalent of a military judge -- and the members performed the duties of both judge and jury. See Winthrop, supra at 54-55. It was not until 1951 that courts-martial included law officers who presided with the authority to rule finally on matters of law and did not also serve as members of the panel. See 1 F. Gilligan & F. Lederer, Court-Martial Procedure § 14-10.00 at 544-45 (2d ed. 1999); United States v. Norfleet, 53 MJ 262, 266 (2000). Thus, until 1951, rulings on all legal issues in the Army, including rulings on motions, were made by the president of the court-martial or the law member

(Article of War[3] (AW) 8 (1920)), subject to the objection of the other members (see AW 31 (1920)).  The material from Winthrop quoted at length simply reflects Winthrop's understanding that an accused had the opportunity to challenge the validity of regulations before a court-martial -- a body that acted as both judge and jury.  The material in Winthrop does not demonstrate that the issue of validity was treated as an element with the Government bearing the burden of proof.  Instead, Winthrop made clear that the court-martial should employ traditional legal analysis, applying the presumption of a regulation's validity, to be overturned only if clearly contradicted by other established authority.  Id. at 575-76.[4]

Our fifth point of disagreement involves the differences between a court-martial panel and a civilian jury.  The Sixth Amendment right to trial by jury does not apply to courts-martial.  Ex Parte Quirin, 317 U.S. 1, 39-45 (1942); see also

---

[3]  The Navy and Marines were governed by the Articles for the Government of the Navy, W. Generous, Swords and Scales 10-11 (1973), and did not have a "law officer until 1951.  Hearings, supra [___ MJ at (12)] at 1153.
[4]  Similar considerations apply with respect to W. De Hart, Observations on Military Law and the Constitution and Practice of Courts-Martial (1846), cited in the separate opinion, ___ MJ at (9-10), which was published a half-century before the 1896 original publication of Winthrop's second edition.  The separate opinion also relies on J. Snedeker, Military Justice Under the Uniform Code 599 (1953), ___ MJ at (9).  Snedeker's discussion of lawfulness is not based upon any decisions under the Uniform Code of Military Justice requiring the military judge to treat lawfulness as an element rather than as a question of law.  The sole citation in Snedeker is to a pre-UCMJ 1945 court-martial, see id. at 599 n.50, which involved the routine issue as to whether an order was lawful, and did not address the allocation of responsibilities between the court-martial and the law officer or military judge -- a position that had not been established in 1945.

United States v. New, No. 99-0640/AR

United States v. Loving, 41 MJ 213, 285, 287 (1994), aff'd on other grounds, 517 U.S. 748 (1996); United States v. Curtis, 32 MJ 252, 267 (CMA), cert. denied, 502 U.S. 952 (1991). Accused servicemembers are tried by a panel of their superiors, not by a jury of their peers. Court-martial members are not randomly selected, but instead are chosen by the commander who convenes the court-martial on a "best qualified" basis. See Art. 25(d)(2), UCMJ, 10 USC 825(d)(2); United States v. Tulloch, 47 MJ 283, 285 (1997).

Although the court-martial members perform many of the functions of a jury with respect to the determination of guilt or innocence, throughout most of our history, the court-martial panel has served as both judge and jury. Even today, the UCMJ retains provisions for special court-martial members to serve as both judge and jury, with power to adjudicate a sentence of up to one year's[5] confinement. If a military judge cannot be

---

[5] Art. 19 provides in part:

Special courts-martial may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by this chapter [10USCS §§ 801 et seq.] except death, dishonorable discharge, dismissal, confinement for more than six months, hard labor without confinement for more than three months, forfeiture of pay exceeding two-thirds pay per month, or forfeiture of pay for more than six months. A bad-conduct discharge, confinement for more than six months, or forfeiture of pay for more than six months may not be adjudged unless a complete record of the proceedings and testimony has been made, counsel having the qualifications prescribed under section 827(b) of this title [10 USCS § 827(b)] (article 27(b)) was detailed to represent the accused, and a military judge was detailed to the trial, except in any case in which a military judge could not be detailed to the trial because of physical conditions or military exigencies. In any such case in which a military judge was not detailed to the trial, the convening authority shall make a detailed written statement, to be appended to the record, stating the reason or reasons a military judge could not be detailed.

detailed "because of physical conditions or military exigencies," the members of a special court-martial may act as both judge and jury in a case that results in a punitive discharge and up to 12 months' confinement. Art. 19, UCMJ, 10 USC § 819 (as amended Oct. 5, 1999). These provisions and the historical functions of a court-martial panel underscore our conclusion that when Congress inserted the word "lawful" in the statutes governing disobedience, it was addressing the judicial role of the court-martial panel rather than creating an element for consideration by a factfinder.

Sixth, we do not agree that application of the principles in United States v. Gaudin, 515 U.S. 506 (1995), requires that lawfulness of a regulation or order, in terms of its relationship to other provisions of law, be treated as an element of a disobedience offense. The underlying principle in Gaudin -- that the judge must instruct the jury on the elements of the offense -- is not a matter in controversy because it is well established by statute in the Uniform Code of Military Justice. See Art. 51(c)(setting forth the relationship between the military judge and the court-martial panel on elements and instructions). Thus, although the Supreme Court found it necessary to resort to constitutional principles in Gaudin, the allocation of responsibilities may be addressed as a matter of statutory interpretation in the military justice system.

21

The question in the present case is not whether the military judge must instruct the court-martial panel on the elements of an offense.  That question is resolved by Article 51(c).  Accordingly, treatment of the constitutional issues discussed in Gaudin does not control the present case.  The question before us is a matter of statutory interpretation -- whether, in this case, the issue of lawfulness was an element, and therefore should have been submitted to the members under Article 51(c); and if not an element, whether the military judge properly decided the issue of lawfulness as a question of law under Article 51(b).  In that regard, it is noteworthy that Gaudin focused on the interpretation of a unique statute and did not purport to set forth general principles of interpretation applicable to all statutes.  Moreover, in Gaudin, there was no dispute as to whether the word "material" constituted an element because the Government "conceded" that point.  Id. at 511.  Both sides also agreed on the definition of "materiality," i.e., that "[t]he statement must have a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."  515 U.S. at 509 (internal quotation marks omitted).[6]

---

[6]  In Neder v. United States, 527 U.S. 1 (1999), the Supreme Court again addressed "materiality," in the context of mail fraud, wire fraud, and bank fraud, under 18 USC §§ 1341, 1343, and 1344.  The Neder opinion makes clear that materiality is a fact laden concept and includes a finding of fact that "a reasonable man would attach importance" to the matter or "the maker of the representation knows or has reason to know ... the matter is important."  527 U.S. at 22 n.5, citing Restatement (2d) of Torts § 538 (1976).

22

The present case initially involves the question of whether it is necessary to consider lawfulness of an order as a separate and discrete element under Article 92. Inclusion of the word "lawful" in Article 92 did not add a separate element to the offense of violating a regulation or order. The word "lawful" reflects a question of law -- the validity of the regulation or order with respect to a superior source of law -- that is inherent in the terms "order" and "regulation" under Article 92.[7] The word "lawful" simply reinforces the opportunity for the accused to challenge the validity of the regulation or order with respect to a superior source of law without establishing a separate and distinct element of the offense. In light of the legislative history of the Code and the Manual, we conclude that "lawfulness" is a legal question for the judge. It is entirely different from many other matters which must be submitted to the court members such as "wrongfulness" or "materiality" if a servicemember is charged with a violation of 18 USC §§ 1001 under Article 134, UCMJ, 10 USC § 934. Adjudicating the issue of lawfulness as a question of law for the military judge ensures that the validity of the regulation or order will be resolved in a manner that provides for consistency of interpretation through appellate review. By contrast, if the

_____

[7] Winthrop recognized that point when he noted, "The word 'lawful' is indeed surplusage, and would have been implied from the word 'command' alone, but, being used, it goes to point the conclusion affirmed by all the authorities that a command not lawful may be disobeyed...." Winthrop, supra, at 575.

issue of lawfulness were treated as an element that must be proved in each case beyond a reasonable doubt, the validity of regulations and orders of critical import to the national security would be subject to unreviewable and potentially inconsistent treatment by different court-martial panels.

Seventh, we note a significant internal contradiction in Judge Sullivan's approach. The separate opinion asserts that "lawfulness of an order" is "an essential element of a disobedience offense," __ MJ at (2), and takes note of "the basic constitutional right of a criminal defendant 'to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged.'" __ MJ at (27) (citing Gaudin, supra at 522-23) internal quotation marks omitted (emphasis added in the separate opinion). The separate opinion also notes that "a military accused has a codal and constitutional right to have members of his court-martial, not the military judge, determine whether the Government has proved, beyond a reasonable doubt, each and every element of the offense of which he is charged." __ MJ at (12) (footnote omitted). Elsewhere, however, the separate opinion endorses the proposition that the military judge may treat "lawfulness" in a disobedience case as a question of law and that the military judge properly did so in the present case, at least with respect to most of the issues raised by appellant. See __ MJ at (2, 6).

We cannot have it both ways.  This case requires us to decide, with respect to regulations and orders under Article 92, whether "lawfulness" is a discrete element or whether it is a question of law.  If "lawfulness" is indeed an "essential element," the accused in a military trial has a statutory right for the issue to be resolved by the members under Article 51.  If, however, "lawfulness" is a question of law, it may be resolved by the military judge.  The cases cited in the separate opinion, __ MJ at (6), support the role of the military judge in deciding issues of law, but do not authorize the military judge to withhold "essential elements" from the members.  If we agreed that as a matter of statutory interpretation "lawfulness" established a discrete "essential element," we would hold that the issue should have been submitted to the members.  Because we conclude in this case that "lawfulness" is a question of law, the military judge did not err by resolving it himself without submission to the members.

Finally, we do not agree with Judge Sullivan's assessment of the impact of any error.  The separate opinion asserts that the issue of lawfulness of an order was "an essential element of this criminal offense," ___ MJ at (21); that it was an error of constitutional dimension for the military judge to decide this issue without submitting it to the members; and that the error was so egregious that it constituted a "radical departure from

25

our political, legal, and military tradition." __ MJ at (2). The separate opinion nonetheless concludes that these considerations are of no moment because, in his view, the order was lawful, and any misstep by the military judge was harmless under Neder, 527 U.S. at 4. ___ MJ at (37).

As noted above, if Judge Sullivan is correct in his assertion that lawfulness is an element that must be submitted to the members, we -- as an appellate court -- would have no more authority than the military judge to render a decision without requiring further proceedings to submit it to the members. Judge Sullivan's analysis of the order, which embodies the characteristics of judicial reasoning on an issue of law, underscores our conclusion that the issue at trial was a question of law for resolution by the military judge, rather than an element of an offense requiring a factfinding panel or jury to weigh the evidence.

Judge Sullivan's conclusion that this is a harmless-error case is inconsistent with Neder, which provided that omission of an element could be viewed as harmless only when "supported by uncontroverted evidence" on the question of materiality in tax-fraud charges. 527 U.S. at 18. If, as Judge Sullivan suggests, the issue of "lawfulness" of an order is a matter which involves introduction of evidence to be weighed by the members, appellant clearly produced at trial a large volume of material contesting

the lawfulness of the order.  Had this been a question for the members of the court-martial panel, it would have been within their province to analyze the controverted material and reach a judicially unreviewable decision to acquit appellant.  Similar considerations apply to Senior Judge Everett's separate opinion on this point.  Both opinions apply Neder in a manner that discounts the large volume of material submitted by appellant contesting the lawfulness of the order, which would be more than sufficient to go before a panel if this were an element for resolution by the members.  In rejecting that material, they effectively treat the question as a matter of law rather than as an element of an offense.  As a result, both reach the conclusion -- with which we agree -- "that the order to wear the UN patches and cap was lawful, i.e., it was properly authorized, related to a military duty, and violated no applicable service uniform regulations."  __ MJ at (37).

## ISSUE III – LEGALITY OF THE ORDER

This Court reviews the question of whether the military judge correctly determined that an order was lawful on a de novo basis.  48 MJ at 277.  The test for assessing the lawfulness of an order under Article 92 comes from paragraph 14c(2)(a)(iii), Part IV, Manual for Courts-Martial, United States (1995 ed.) which states in pertinent part:

> The order must relate to military duty, which
> includes all activities reasonably necessary to

> accomplish a military mission, or safeguard or promote
> the morale, discipline, and usefulness of members of a
> command and directly connected with the maintenance of
> good order in the service. The order may not, without
> such a valid military purpose, interfere with private
> rights or personal affairs. However, the dictates of a
> person's conscience, religion, or personal philosophy
> cannot justify or excuse the disobedience of an
> otherwise lawful order.

See United States v. Hughey, 46 MJ 152, 154 and n.2 (1997).

Orders are clothed with an inference of lawfulness. See Hughey, 46 MJ at 154; United States v. Nieves, 44 MJ 96, 98 (1996). "An order requiring the performance of a military duty or act may be inferred to be lawful and it is disobeyed at the peril of the subordinate. This inference does not apply to a patently illegal order, such as one that directs the commission of a crime." Para. 14c(2)(a)(i), Part IV, Manual, supra (1995 ed.). Appellant has the burden to establish that the order is not lawful. Hughey, 46 MJ at 154; United States v. Smith, 21 USCMA 231, 234, 45 CMR 5, 8 (1972).

We hold that the military judge did not err in determining that the order given to appellant to wear his uniform with UN accoutrements was lawful. The military judge correctly determined that the evidence presented by appellant did not overcome the presumption of lawfulness given to military orders and that the order related to military duty.

Appellant argues that (1) the UN insignia violates Army uniform regulations (AR 670-1) by transferring his allegiance to the United Nations, 50 MJ at 734, and (2) the order stems from an illegal deployment of the Armed Forces because President Clinton misrepresented the nature of the deployment to Congress and failed to comply with the United Nations Participation Act [UNPA].[8]  50 MJ at 736.  These arguments fail because they would unacceptably substitute appellant's personal judgment of the legality of an order for that of his superiors and the Federal Government.

This Court has held that an Air Force Captain disobeyed a lawful order when he refused to fly as a training instructor on a fighter plane that was used in Vietnam.  United States v. Noyd, 18 USCMA 483, 485-86, 40 CMR 195, 197-98 (1969).  The Noyd court noted that "[m]ilitary service is . . . a matter of status," like becoming a parent, rather than just a contractual relationship and that status establishes special duties between the soldier and the Government.  18 USCMA at 490, 40 CMR at 202.  It further noted that "the fact that a person in a military status determines that he has undergone a change of conscience does not, at that instant and from that time on, endow him with

---

[8]  As we will rule on Issue IV (see ___ MJ at (34-36)) that the lawfulness of the order to deploy troops as part of the U.N. mission is beyond judicial review because it is a political question, we will decline to address any aspect of appellant's argument on Issue III that implicates this issue.

the right to decide what orders are compatible with his conscience."  18 USCMA at 491, 49 CMR at 203.

The Supreme Court has recognized the importance of the military mission over the beliefs of the individual soldier on the specific issue of uniform requirements.  The Court held that Air Force regulations that prohibited wearing a yarmulke are not prohibited by the First Amendment, "even though their effect is to restrict the wearing of the headgear required by his religious beliefs."  Goldman v. Weinberger, 475 U.S. 503, 510 (1986).  The Court reasoned that "[t]he desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment."  Id. at 509. the Court stated:

> The considered professional judgment of the Air Force is that the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission.  Uniforms encourage a sense of hierarchical unity. . . .  The Air Force considers them as vital . . . because its personnel must be ready to provide an effective defense on a moment's notice; the necessary habits of discipline and unity must be developed in advance of trouble.

Id. at 508.  Based on this reasoning, we conclude that uniform requirements are considered essential to the military mission for the purpose of determining lawfulness.

Although the Goldman decision was overtaken by statute, 10 USC § 774, which now permits wearing religious apparel under

certain conditions, its reasoning on uniform requirements is still sound. If uniform requirements relate to military duty, then an order to comply with a uniform requirement meets the "military duty" test set forth in paragraph 14c(2)(a)(iii).

We recently considered the issue of the "military duty" requirement in finding lawful an order given to a Marine not to drive his personal vehicle because he had been diagnosed with narcolepsy. United States v. McDaniels, 50 MJ 407 (1999). Distinguishing that case from orders held to be illegal, such as not to drink alcohol or speak to other soldiers, see cases cited at 50 MJ 408, we held that the order in McDaniels was within military authority because it protected other persons. In appellant's case, it is difficult to think of a requirement more necessary to promoting the basic FYROM UNPREDEP military mission or to safeguarding discipline and morale of deployed troops than uniform requirements. See United States v. Young, 1 MJ 433, 435 (CMA 1976)(identification of personnel and development of esprit de corps justify military uniform requirements for hair cuts).

It is not a defense for appellant to claim that the order is illegal based on his interpretation of applicable law. An order is presumed to be lawful and the defense has the burden to prove illegality unless the order is "palpably illegal on its face." United States v. Kapla, 22 CMR 825, 827 (AFBR 1956) quoting Winthrop's Military Law and Precedents 585-76 (2d ed.

1920 Reprint).  This does not, however, allow a soldier to disobey an order because he believes it to be palpably illegal. A case remarkably similar to this one is United States v. Wilson, 19 USCMA 100, 41 CMR 100 (1969).  Private Wilson was denied conscientious-objector status and, after an unauthorized absence, wrote a statement explaining, in part, "I will refuse to wear the uniform of a soldier ever again.  I am doing this out of my deeply felt convictions . . . and because the Army has given me no other alternative."  19 USCMA at 100-101, 41 CMR at 100-01.  When he later refused to obey an order to wear his uniform, he was charged with willful disobedience.  This Court upheld an instruction that personal scruples were not a defense. Citing United States v. Noyd, supra, the Court in Wilson reasoned that personal beliefs could not justify or excuse disobedience by a soldier of a lawful order.

> His position is like that of the civilian whose religion or conscience is in conflict with lawful orders of the Government . . . [T]o allow scruples of personal conscience to override the lawful command of constituted authority would "in effect . . . permit every citizen to become a law unto himself."  Reynolds v. United States, 98 U.S. 145, 167, 25 L. Ed. 244 (1879).  As Noyd indicated, the freedom to think and believe does not excuse intentional conduct that violates a lawful command.

19 USCMA at 101, 41 CMR at 101.  The Court in Noyd also noted that allowing private judgment by a soldier as to which orders to obey would be "unthinkable and unworkable," and would mean that "the military need for his services must be compromised."

32

18 USCMA 491, 40 CMR at 203.  Appellant's arguments are essentially the same ones that were made there, and they should be rejected on the same basis.

We recently reiterated the limited nature of the grounds upon which the lawfulness of an order may be challenged in the context of denied conscientious-objector status.  We determined that there was no constitutional right or statutory provision that gave an appellant "authority for a self-help remedy of disobedience."  United States v. Johnson, 45 MJ 88, 92 (1996), citing United States v. Lenox, 21 USCMA 314, 319, 45 CMR 88, 93 (1972).

Issue IV – APPLICATION OF THE POLITICAL QUESTION DOCTRINE

The Supreme Court has long recognized the principle of "nonjusticiability":  meaning that courts of law should decline to exercise their authority to decide matters where judicial intervention is deemed inappropriate.  Based upon the Constitutional principle of separation of powers in the three branches of Government, judicial review of "a political question" is precluded where the Court finds one or more of the following:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an

> unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker v. Carr, 369 U.S. 186, 217, 218 (1962); see also Flast v. Cohen, 392 U.S. 83, 95 (1968).

The Constitution assigns specific military responsibilities to the Executive and Legislative branches of the Government. The President is Commander-in-Chief of the Armed Forces,[9] but Congress has the power to declare war and to organize, arm, and govern the military.[10]

The determination whether lawfulness of the order to deploy is a political question and thus nonjusticiable is reviewed on a de novo standard. Padgett, 48 MJ at 277.

While the military judge determined that the order to wear the U.N. insignia was lawful, he properly declined to rule on the constitutionality of the President's decision to deploy the Armed Forces in FYROM as a nonjusticiable political question. Courts have consistently refused to consider the issue of the President's use of the Armed Forces. Two recent examples from the Persian Gulf War era are Ange v. Bush, 752 F. Supp. 509 (D.D.C. 1990), and United States v. Huet-Vaughn, 43 MJ 105 (1995). In the Ange case, the District Court declined to rule on the legality of deployment of troops in the Persian Gulf

---

[9] U.S. Const. Art. II § 2.
[10] U.S. Const. Art. I § 8, cl. 11-14.

34

despite inconsistent views of Congress and the President.  752 F. Supp. at 512.  In Huet-Vaughn, we reaffirmed the idea that personal belief that an order is unlawful cannot be a defense to a disobedience charge, holding: "The duty to disobey an unlawful order applies only to a positive act that constitutes a crime that is so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness."  43 MJ at 114 (internal quotation marks omitted).  The Court further upheld the military judge's decision not to consider evidence relating to the legality of the decision to deploy the Armed Forces.  43 MJ at 115.

The basic nature of the separation-of-powers issue was also discussed in a Vietnam-era case where soldiers disobeyed an order to board a sedan for further transportation to Vietnam on the grounds that American involvement there was itself illegal. United States v. Johnson, 17 USCMA 246, 247, 38 CMR 44, 45 (1967).  This Court noted that the Supreme Court refused to consider challenges to the President's use of the armed forces abroad.  In addition, the Court distinguished Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579 (1952), since it involved use of military power in a purely domestic dispute.  The Court noted Justice Jackson's concurrence in Youngstown Sheet and Tube Co., where he stated: "I should indulge the widest latitude of interpretation to sustain [the President's] exclusive function

to command the instruments of national force, at least when turned against the outside world for the security of our society."  343 U.S. at 645.

Under these standards, we hold that this question qualifies as a nonjusticiable political question.

The decision of the United States Army Court of Criminal Appeals is affirmed.

EFFRON, Judge (concurring):

I concur in the majority opinion.  I write separately to address a number of issues identified in the course of considering the present case that may bear on future litigation concerning the legality of orders.

I. Application of the Political Question Doctrine

A

According to appellant, the prosecution failed to prove that he had received a lawful order because the order was in furtherance of actions which he viewed as illegal -- the deployment of American troops to the Republic of Macedonia and the development of command and control functions and associated uniform requirements.  As noted in the majority opinion, these matters were properly resolved by the military judge under the Supreme Court's political question doctrine.  See Gilligan v. Morgan, 413 U.S. 1, 6-12 (1973).

The political question doctrine serves a particularly important function in military trials by ensuring that courts-martial do not become a vehicle for altering the traditional relationship between the armed forces and the civilian policymaking branches of government.  Since the days of George

Washington, America has demonstrated that military professionalism is compatible with civilian control of the armed forces.  With few exceptions, American military personnel have been faithful to the concept that once their advice has been tendered and considered, they are duty-bound to implement whatever policy decisions the civilian leadership may make.

Appellant would have us change the nature of that relationship by requiring courts-martial to adjudicate the relationships between Congress and the President regarding the deployment of military forces.  Consider, for example, the implications of appellant's approach in the context of the Korean conflict, where adversity in frozen fields far from home intensified a bitter national debate over the propriety of U.S. participation in an undeclared war conducted under the United Nations' auspices.  Under appellant's approach, courts-martial would have been authorized to adjudicate the relationships between Congress and the President, potentially permitting members of the armed forces to disobey unpopular orders.  There is nothing in the more than 2 centuries of our history as a Nation that suggests courts-martial should be empowered to rule on the propriety of deployment orders as a matter of either constitutional or military law.

B

Appellant not only insists that courts-martial should rule on the legality of deployment orders, but he also contends that the military judge should submit the issue of legality to the members as an essential element of the offense.  Such an approach would be even more problematic than permitting judges to adjudicate the legality of deployments because dispositions by members would produce unreviewable decisions.  See Art. 63, UCMJ, 10 USC § 863 (an acquittal is final and unreviewable).  Rather than producing the unity and cohesion that is critical to military operations, appellant's approach could produce a patchwork quilt of decisions, with some courts-martial determining that orders were legal and others determining that the same orders were illegal, without the opportunity for centralized legal review that is available for all other issues of law.

C

It is apparent that appellant has carefully considered the legality of the orders at issue and that he has formed sincere, deeply held views about the legal basis for the deployment of his unit and the related matters of command and control and uniform arrangements.  Congress has provided him with a variety of means to communicate his views to his superiors and national

policy makers. He may challenge policy through a complaint under Article 138, UCMJ, 10 USC § 938; he may raise his concerns to the Inspector General of the Department of Defense, 5 USC Appendix; and he may communicate directly with Members of Congress and Inspectors General without interference from his military superiors and with protections against reprisal, 10 USC § 1034. The record indicates that he has exercised his right to communicate with Members of Congress. Although Congress has acted from time to time to limit deployments, regulate command and control arrangements, and specify uniform requirements, it has not done so with respect to the issues raised by appellant. Congressional inaction does not entitle him to address such issues through disobedience and then seek the protection of a court-martial, at least to the extent that the issues of concern to him involve political questions committed to the policymaking branches of government rather than rights granted to him by the Constitution, statutes, or regulations.

### D

It is important to emphasize that the political question doctrine may not be used as an excuse for avoiding issues committed by law to the court-martial process. The political question doctrine in a disobedience case arises in a context very different from civil litigation. In the typical civil

case, a party initiates litigation as a means of interjecting the courts into a dispute between the two policymaking branches of government. In a court-martial for disobedience, the Government -- not the accused -- has initiated the litigation. Reliance on the political question doctrine in such circumstances is appropriate only when the legal principles at issue are directed at the allocation of responsibilities between the two policymaking branches of the government. Where the legal principles are directed at the rights and responsibilities of servicemembers, the political question doctrine may not be used to avoid addressing the legality of orders invoking those principles, even if those questions touch upon the responsibilities of the policymaking branches. Cf. United States v. Caceres, 440 U.S. 741 (1979) (distinguishing between those rules designed to protect the rights of citizens and those designed to affect the management of governmental functions).

Military courts have long considered the legality of orders in cases in which an accused was directed to commit a crime or in which the purported order violated a legal standard designed to preclude commanders from abusing the fundamental rights of their subordinates or directing their subordinates to engage in criminal activities. Likewise, military courts traditionally have permitted servicemembers to defend against other charges by asserting obedience to lawful orders. Nothing in today's

5

opinion should be viewed as permitting a military judge to avoid ruling on the legality of an order in such a case simply because the issue bears certain attributes of a political question.

## II. The Tension Between Prompt Obedience and Challenges to the Lawfulness of Orders

### A

The Supreme Court has emphasized that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." United States ex rel. Toth v. Quarles, 350 U.S. 11, 17 (1955). To persevere and prevail amidst the danger, death, destruction, and chaos of armed combat, military personnel must develop the disciplined habit of prompt obedience to the directives of their superiors.

Although modern military practices typically foster opportunities for discussion before a decision is made, prompt obedience is expected once an order is given. The Supreme Court has observed that "[a]n Army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier." Parker v. Levy, 417 U.S. 733, 744 (1974), quoting In re Grimley, 137 U.S. 147, 153 (1890). "[T]o accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."

Goldman v. Weinberger, 475 U.S. 503, 507 (1986) (emphasis added).

Although the law expects prompt and instinctive implementation of orders, it does not envision unquestioning obedience. Only "lawful" orders must be obeyed. Art. 92; see RCM 916(d), Manual for Courts-Martial, United States (1998 ed.). There has always been an uneasy tension between the concept of "instinctive obedience" and the expectation that servicemembers will not obey unlawful orders. The present case has brought to light several issues growing out of that tension that may warrant further attention.

First, should the Manual for Courts-Martial provide more detailed guidance as to the appropriate means by which the legality of an order should be raised and adjudicated in a court-martial? Should it be through a motion to dismiss for failure to state an offense on the ground that the illegality deprives the directive of its status as an "order"? Should it be recast as an affirmative defense? Should both approaches be available?

It is noteworthy that the legality of an order is treated as a defense when it is raised in the context of crimes other than disobedience offenses - for example, assault or homicide. See RCM 916(d). In one of our earliest cases, United States v. Trani, 1 USCMA 293, 3 CMR 27 (1952), we considered the procedure

7

for assessing the legality of an order in a disobedience case. We observed that

> [i]t is a familiar and long-standing principle of military law that the command of a superior officer is clothed with a presumption of legality, and that the burden of establishing the converse devolves upon the defense.

1 USCMA at 296, 3 CMR at 30 (citing W. Winthrop, Military Law and Precedents 575-76 (2d ed. 1920 Reprint)). After noting that "it does not appear that the order was unlawful on its face," we commented that "it remains to be seen whether it has been shown affirmatively to be illegal." 1 USCMA at 297, 3 CMR at 31 (emphasis added). Trani has never been overruled or distinguished. It could be viewed as consistent with either an affirmative defense approach or an approach based upon failure to state an offense.

Second, what circumstances should be encompassed by the terms "lawful," "unlawful," and "illegal" as applied to offenses involving obedience or disobedience of orders? Paragraph 415, Manual for Courts-Martial, United States, 1917, at 210, sets this high standard:

> To justify from a military point of view a military inferior in disobeying the order of a superior, the order must be one requiring something to be done which is palpably a breach of law and a crime or an injury to a third person, or is of a serious character (not involving unimportant

8

> consequences only) and if done would not be
> susceptible of being righted.

Subsequent editions of the Manual streamlined this language, relying instead on descriptions of various types of orders within or outside the statute. See para. 134b, Manual for Courts-Martial, U.S. Army, 1928; para. 152b, Manual for Courts-Martial, U.S. Army, 1949; para. 169b, Manual for Courts-Martial, United States, 1951; para. 169b, Manual for Courts-Martial, United States, 1969 (Revised edition); para. 14c(2)(a), Part IV, Manual, supra (1998 ed.). The current guidance, however, does not address what types of deficiencies affect the validity of an order in the context of a disobedience offense. Aside from matters involving the political question doctrine, what other questions should be excluded from or included in the concept of lawfulness as it pertains to orders?

Third, are other changes warranted as a result of the manner by which the complexity and scope of modern military operations have significantly altered the nature of military life? The 19th century model, in which military personnel were directed primarily by personal orders from an immediate superior, has been transformed by the 21st century reality into an environment governed by thousands of pages of directives, regulations, standard operating procedures, and policy manuals issued by a variety of military and civilian authorities at

9

service, joint, and international command levels.  Under what circumstances should a servicemember be permitted to rely on one of these issuances to disobey a direct command from a superior?

It is well established that a servicemember may defend against a disobedience charge by demonstrating that compliance with the order would constitute a crime or would violate a standard of law intended to protect significant rights of the servicemember or a third party.  Should an order be treated as not "lawful" if it is inconsistent with another issuance, even if that issuance addresses only routine administrative matters?  If not, under what circumstances should a servicemember who alleges reasonable reliance on the administrative issuance be permitted to raise a defense of mistake of fact or mistake of law?

Fourth, how should the burden of demonstrating the legality or illegality of an order be allocated?  Do the references in the Manual and case law to a "presumption" or "inference" of legality suggest that the production of any information to the contrary negates the presumption and places the burden on the prosecution to prove the legality of the order?  Alternatively, in the context of an issue of law, should the presumption or inference simply mean that the issue of legality does not arise until raised by some information presented to the military judge

in an appropriate motion and that, once presented, the military judge considers the issue de novo like many other issues of law?

Fifth, should the relative responsibilities of the military judge and the members of the court-martial panel be revisited? As noted above, the present Manual (2000 ed.) provides some guidance in paragraph 14c(2)(a), Part IV, on which types of orders may be considered lawful or unlawful, but provides no guidance on the allocation of duties within the court-martial itself.

RCM 801(e), governing the power of the military judge to rule finally on interlocutory questions and questions of law, provides the following general guidance: first, any ruling on a question of law or interlocutory question is final--RCM 801(e)(1)(A); and second, the military judge decides questions of fact within an interlocutory question under a preponderance-of-the-evidence standard--RCM 801(e)(4). The text of the rule does not address the legality of orders. The non-binding Discussion accompanying RCM 801(e)(5) briefly notes that "the legality of an act is normally a question of law. For example, the legality of an order when disobedience of an order is charged . . . normally [is a] question[] of law." In short, the Rule is silent and the Discussion contemplates no role for the court members. Regardless whether it is an issue of law or an

11

issue of fact, the Discussion contemplates that the matter will
be resolved by the military judge.

The Military Judges' Benchbook, however, takes a different
approach.  The non-binding model instructions for Article 92
offenses provide:

> When it is clear as a matter of law that the
> order was lawful, this should be resolved as
> an interlocutory question . . . .
>
> *   *   *
>
> If there is a factual dispute as to whether
> or not the order was lawful, that dispute
> must be resolved by the members in
> connection with their determination of guilt
> or innocence. . . .
>
> *   *   *
>
> If the military judge determines, as a
> matter of law, that the order was not
> lawful, [the judge] should dismiss the
> affected specification . . . .

Para. 3-29, Military Judges' Benchbook at 3-59 (Dept. of the
Army Pamphlet 27-9 (Oct. 1986)).  This guidance appears to be
inconsistent with RCM 801(e).  If the question of lawfulness
should continue to be treated as an interlocutory question or a
question of law, then under RCM 801(e), it is the responsibility
of the military judge -- not the members -- to decide questions
of law and any questions of fact arising thereunder.

The Benchbook, however, clearly reflects a degree of
discomfort with the removal of any role for the members in such

a case beyond determining whether the order was, in fact, issued and received.  Although there have been lower court opinions rejecting defense challenges to the adequacy of instructions following the Benchbook approach, e.g., United States v. Tiggs, 40 CMR 352 (ABR 1968), pet. denied, 18 USCMA 630, 39 CMR 293 (1969), it does not appear that any cases have addressed the relationship between the Manual and the Benchbook in terms of the roles of the members and the military judge.

In contrast to the Manual's focus on the military judge as the decision maker on the issue of legality in disobedience cases, the Manual contemplates a role, albeit somewhat limited, for the members in considering the legality of an order when raised as a defense to another crime.  RCM 916(d), which governs the defense of obedience to orders, provides:

> It is a defense to any offense that the
> accused was acting pursuant to orders unless
> the accused knew the orders to be unlawful
> or a person of ordinary sense and
> understanding would have known the orders to
> be unlawful.

The prosecution has "the burden of proving beyond a reasonable doubt that the defense" of obedience to orders "did not exist." RCM 916(b).  The military judge decides as a matter of law whether the order raised by the defense was lawful.  If so, the defense of justification applies and the charge is dismissed.  See RCM 916(c).  If the military judge rules that

13

the order was unlawful, the judge so instructs the members and the members then decide whether the prosecution has proved beyond a reasonable doubt that the accused actually knew that the order was unlawful or that a person of ordinary sense would have known that the order was unlawful.  See United States v. Calley, 22 USCMA 534, 541-42, 48 CMR 19, 26-27 (1973).

In view of the role given to the members in assessing the reasonableness of a servicemember's interpretation of the legality of an order when raised as a defense, should they be given a similar role under the Manual in assessing legality in a disobedience case?  If so, what role should they be given?  Should the guidance in the Benchbook be given stature in the Manual?  If so, how should it be reconciled with RCM 801(b), under which the factual components of an interlocutory issue are resolved by the military judge, not the members?

Underlying these concerns is the question of which issues involving the legality of an order call for the expertise that a blue ribbon court-martial panel brings to the process and which call for the expertise that a military judge brings to the process.  As our men and women in uniform are increasingly deployed to serve as peacekeepers and peace enforcers in challenging circumstances in which traditional rules of engagement are difficult to employ, it is quite possible that these questions will arise in a real, rather than theoretical,

14

situation.  It is an area in which a fresh review and possible modification of the guidance in the Manual could be most helpful.  To the extent that this guidance would involve procedural matters, the President has the authority to establish authoritative rules in the Manual under Article 36, UCMJ, 10 USC § 836.  To the extent that such guidance would involve interpretation of substantive offenses, it would be binding to the extent that it provided rights greater than those available under the statute.  In any case, such guidance would be given considerable deference.

Although the temptation often is great -- with good justification -- to allow the law to develop through the process of litigating specific cases, this is an area in which many weighty questions affecting the fundamental rights and obligations of servicemembers remain unanswered.  In that context, a serious effort to address the questions concerning the process of adjudicating the legality of orders would appear to be in the best interest of our Nation and our men and women in uniform.

United States v. New, 99-0640/AR


SULLIVAN, Judge (concurring in the result):


INDEX

I      Overview                                           2

II     The Political-Question Doctrine                    5
       Resolves All Claims But One

III    General View of the Case                           7

IV     General View of the Law                            9

V      Trial                                             12

VI     Lawfulness of Order As Element                    16


VII    Lawfulness of Order is Not an Interlocutory       21
       Question of Law

VIII   Error under Gaudin                                25


IX     Harmless Error under Neder                        33

X      Conclusion                                        37

## I
## Overview

Thousands of military orders are given each day in our armed forces as they have been given throughout the history of our great country.  Article 92(2), Uniform Code of Military Justice, 10 USC § 892, legislatively reflects the traditional Anglo-American view that only the disobedience of "lawful" orders is prohibited.  See, e.g., Articles 90(2), 91(2), and 92(1), UCMJ, 10 USC §§ 890(2), 891(2), and 892(1), respectively.  Today, the majority characterizes the lawfulness of an order as mere "surplusage" and judicially eliminates it as an essential element of a disobedience offense.  ___ MJ at (23 and n.7).  I strongly disagree with this radical departure from our political, legal, and military tradition.  See Unger v. Ziemniak, 27 MJ 349, 358 (CMA 1989).

The instant case is ultimately about the process due an American servicemember on trial for the crime of disobedience of a lawful order, i.e., how the lawfulness of the disobeyed order is to be determined at a court-martial and whether that procedure is constitutional.  See generally Weiss v. United States, 510 U.S. 163, 176-81 (1994).  Today, the majority opinion holds that the lawfulness of an order was properly decided as "a question of law" by the military judge in this case and cites Article 51(b), UCMJ, 10 USC § 851(b).  I view the lawfulness of an order in a disobedience case as an element of that offense which in

2

appellant's case presented a justiciable mixed question of fact and law that the members of his court-martial should have decided. See Article 51(c) and United States v. Gaudin, 515 U.S. 506, 522-23 (1995) (elements of a criminal offense which are mixed questions of fact and law must be determined by the jury members).

Finally, modern military legal practice has long provided a procedure for determining the lawfulness of an order in disobedience cases. See para. 3-16-3 n.3, Military Judges' Benchbook (Department of the Army Pamphlet 27-9 (01 April 2001) and (30 Sept. 1996)); see also paras. 3-14-2 n.4; 3-15-2 n.3; 3-16-1, n.3; and 3-16-2 n.4, Benchbook, supra (1996 & 2001 eds.). It is well established that the military judge determines the lawfulness of an order and so instructs the members if no question of fact is raised pertaining to this question. See Unger v. Ziemniak, supra at 359. However, if there are questions of fact raised pertaining to the lawfulness of the order violated, the members of the court-martial are required to determine lawfulness as a mixed question of fact and law. Id. See United States v. Robinson, 6 USCMA 347, 356, 20 CMR 63, 72 (1955); United States v. Zachery, 6 CMR 833, 837 (AFBR 1952) (factual questions concerning legality of order to be decided by members). Today, the majority disregards this long-existing military practice and broadly creates a new rule that the military judge finally decides the lawfulness of an order in all

cases prosecuted under Article 92.  But see United States v. Ornelas, 2 USCMA 96, 99-101, 6 CMR 96, 99-101 (1952) and Article 39(a)(1) and (2), UCMJ, 10 USC § 839(a)(1) & (2); see generally C. Wright, Federal Practice and Procedure:  Criminal 3d § 194 at 366-67 (1999) (pretrial motion raising defenses and objections which implicate trial of general issue should only be decided by jury).  I must disagree with this additional departure from established military practice and its application to appellant's case where I conclude questions of fact were raised concerning the lawfulness of the order violated.  See generally United States v. Scheffer, 523 U.S. 303 (1998); see also United States v. Tualla, 52 MJ 228, 231 (2000) ("[a]dhering to precedent is usually the wise policy" (internal quotation marks omitted)).

The majority's unsettling approach to all these questions is completely unnecessary to resolve appellant's case.  As explained below, appellant had a single justiciable legal claim against his commander's order which was based on a service uniform regulation.  The evidence in this case, however, overwhelmingly established that this order did not violate that Army uniform regulation and was otherwise lawful.  See Neder v. United States, 527 U.S. 1 (1999); see also Johnson v. United States, 520 U.S. 461, 470 (1997).

4

## II
### The Political-Question Doctrine Resolves
### All of Appellant's Claims But One

My separate opinion in this case is expressly limited to the single claim of appellant that the disobeyed order was unlawful because it violated a U.S. Army Uniform Regulation under the facts of his case.  This particular claim is the only claim that raised a contested question of fact.  Appellant made other legal claims that the order to wear certain United Nations (UN) accoutrements on his United States Army uniform was unlawful.  In these other claims, he particularly argued that the order was unlawful based on the constitutional prohibition against involuntary servitude (Amend. XIII), the UN Participation Act, and his enlistment contract. (R. 423)  These arguments involved no real factual disputes and pertained to the legality of his deployment order to Macedonia as part of the UN Peacekeeping Force.  See also United States v. Lenox, 21 USCMA 314, 45 CMR 88 (1972).

It is my view that these particular legal claims (challenges to deployment) are not justiciable issues at a court-martial in a trial for disobedience of orders.  See United States v. Johnson, 17 USCMA 246, 38 CMR 44 (1967).  In this regard, I agree with Judge Effron and Senior Judge Everett that these legal arguments were properly rejected by the military judge.  The disposition of these claims under the political-question doctrine was a pure question of law for the military judge alone (see United States

v. Austin, 27 MJ 227, 230, 234 (CMA 1988); United States v. Phillips, 18 USCMA 230, 234, 39 CMR 230, 234 (1969)) and did not legally violate appellant's right to a decision by the factfinders on all the elements of a crime.  See United States v. Brown, 50 MJ 262, 265 (1999); see also United States v. Bridges, 12 USCMA 96, 99-100, 30 CMR 96, 99-100 (1961) (decision on what law to apply to determine whether element of crime established is solely question of law for president of court-martial).  See generally Article 51(b), UCMJ, 10 USC § 851(b) (1968) (adding "questions of law" authorization for military judge).

The political-question doctrine, however, cannot be used to resolve appellant's additional claim that the order in question violated the U.S. Army Uniform Regulation.  This claim did not require a ruling on the legality of the deployment and raised justiciable questions of fact pertaining to an element of the offense that needed to go to the military jury for resolution. See United States v. Robinson, supra at 353-56, 20 CMR at 69-72. See generally Article 51(c) and United States v. Gaudin, supra. On this point I join the wise and thoughtful opinion of Senior Judge (former Chief Judge) Everett.  His resolution of this particular issue is consistent with my view of this issue.

### III
### General View of the Case

This is the case of Specialist Michael New, an American soldier in Germany, who was ordered by his U.S. Army superiors to put on a United Nations blue beret and UN insignia on his uniform when his unit was alerted for deployment to Macedonia.[1] He refused this order and was ordered to stand trial for that disobedience at a court-martial. Specialist New chose a trial by a court-martial panel of members [hereinafter called a "military jury"].[2]

---

[1] Although this case involves a uniform order, the case is far from being simple. Justice Oliver Wendell Holmes, Jr., once said:

> Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

Northern Securities Company v. United States, 193 U.S. 197, 400-01 (1904) (Holmes, J., dissenting). The present case may be a great case, but we must be mindful not to bend the cherished principle that properly contested elements of a crime are to be decided by the jury whether it is a civilian or a military jury.

[2] A military accused does not have a right to a trial by jury of his peers as provided in the Sixth Amendment. He does have a right to a trial by his military superiors (see Article 25(d)(1), UCMJ, 10 USC § 825(d)(1)) who are selected by the convening authority (see Article 25(d)(2)). I have suggested that the Uniform Code of Military Justice be amended to provide for random selection of members. See United States v. Roland, 50 MJ 66, 70 (1999) (Sullivan, J., concurring in the result).

At the court-martial of Specialist New, in order to successfully prosecute him, the Government basically needed to prove three facts:

> 1. that Specialist New received and understood the order to put on the UN Beret and UN insignia;
>
> 2. that the order was lawful; and
>
> 3. that Specialist New disobeyed the order.

At trial Specialist New did not dispute that the order was given, that he understood it or that he disobeyed it. However he made clear that his intended defense at trial was that the order was unlawful for several different reasons. Thus, his guilt or innocence at trial was to turn largely on the determination by the "military jury" whether the order he disobeyed was lawful or

---

Nevertheless, court-martial panel members in a functional sense are commonly referred to as a military jury. See F. Gilligan and F. Lederer, 2 Court-Martial Procedure § 15-11.00 at 3-4 (1999) ("As a consequence, as long as a military judge is present, court members are merely military jurors lacking any powers that would be considered unique in the civilian world." (Footnote omitted; emphasis added); D. Schlueter, Military Criminal Justice: Practice and Procedure § 15-2(e) at 635 (5th ed. 1999) ("The court members comprise the military's counterpart of the civilian jury."); H. Moyer, Justice and the Military § 2-602 at 529 (1972) ("As with civilian juries, military court members vote on the findings of guilty or innocence."). This Court has also held that certain due process requirements pertaining to civilian juries are applicable to military courts of members even though the military accused has no Sixth Amendment right to trial by jury. See United States v. Witham, 47 MJ 297, 300-03 (1997); United States v. Tulloch, 47 MJ 283, 285 (1997).

unlawful.  As shall be discussed in detail below, his judge
instructed the "military jury" before they deliberated that the
order was lawful.  Thus, the issue of Specialist New's guilt was,
in effect, determined by the judge in his instructions, rather
than by the "military jury" in its deliberations.  In my view,
this was an error under established military procedure and as a
matter of constitutional due process.

## IV
## General View of the Law

As a cadet at West Point[3] and as a soldier, I was taught
that (i) all lawful orders in the U.S. Army were to be obeyed;
and (ii) however, if you believed that an order was unlawful, you
could disobey it but you would risk a court-martial where a
"military jury" would either validate or reject your decision to
disobey.  See J. Snedeker, Military Justice under the Uniform
Code 593, 599 (1953); W. Winthrop, Military Law and Precedents
575-76 (2d ed. 1920 Reprint); W. De Hart, Observations on

---

[3]  Every cadet takes the following oath when he enters the United
States Military Academy at West Point, New York:

I, (full name), do solemnly swear that I will support the
Constitution of the United States, and bear true allegiance to
the National Government; that I will maintain and defend the
sovereignty of the United States, paramount to any and all
allegiance, sovereignty, or fealty I may owe to any State or
country whatsoever; and that I will at all times obey the legal
orders of my superior officers, and the Uniform Code of Military
Justice."  10 USC § 4346 (emphasis added).

Military Law and the Constitution and Practice of Courts-Martial,
165-66 (1846).

Colonel Winthrop stated the following regarding a soldier's decision to disobey an order he thought was unlawful:

> "**Lawful command**." The word "lawful" is indeed surplusage, and would have been implied from the word "command" alone, but, being used, it goes to point the conclusion affirmed by all the authorities that a command <u>not</u> lawful may be disobeyed, no matter from what source it proceeds. <u>But to justify an inferior in disobeying an order as illegal, the case must be an extreme one and the illegality not doubtful. The order must be clearly repugnant to some specific statute, to the law or usage of the military service, or to the general law of the land. The unlawfulness of the command must be a fact, and, in view of the general presumption of law in favor of the authority of military orders emanating from official superiors, the onus of establishing this fact will, in all cases-except where the order is palpably illegal upon its face-devolve upon the defence, and clear and convincing evidence will be required to rebut the presumption.</u>
>
> The legality of the order may depend upon the period, whether one of peace or war, (or other emergency,) at which it is issued. An order which would be unlawful in peace or in the absence of any public exigency, may be perfectly lawful in war as being justified by the usages of civilized warfare. Thus an order for the seizure of citizens' property for the subsistence or transportation of the troops, the construction of defences, &c., or for its destruction to facilitate the operations of the army in the field, or

to prevent its falling into the hands of the enemy, would be not only authorized, but to disobey it would be a grave military crime.  But, in general, in time of peace an order similarly in disregard or private right would be repugnant to the first principles of law, and to fail to obey it would constitute no violation of the present Article.

But <u>while a military inferior may be justified in not obeying an order as being unlawful, he will always assume to do so on his own personal responsibility and at his own risk</u>.  Even where there may <u>seem</u> to be ample warrant for his act, he will, in justifying, commonly be at a very considerable disadvantage, the presumption being, as a rule, in favor of the legality of the order as an executive mandate, and the facts of the case and reasons for the action being often unknown in part at least to himself and in the possession only of the superior.  In the great majority of cases therefore it is found both safer and wiser for the inferior, instead of resisting an apparently arbitrary authority, to accept the alternative or obeying even to his own detriment, thus also placing himself in the most favorable position for obtaining redress in the future.  On other hand, should injury to a third person, or damage to the United States, result from the execution of an order by a subordinate, the plea that he acted simply in obedience tot he mandate of his proper superior will be favored at military law, <u>and a court-martial will almost invariably justify and protect an accused who has been exposed to prosecution by reason of his unquestioning fidelity to duty, holding the superior alone responsible</u>.  How far he will be protected by the civil tribunals, if sued or prosecuted on account of a cause of action or offence

> involved in his proceeding, will be
> considered [elsewhere].

Winthrop, supra at 575-76 (most emphasis added; footnotes omitted).

It is also my view today that a military accused has a codal and constitutional right to have the members of his court-martial, not the military judge, determine whether the Government has proved, beyond a reasonable doubt, each and every element of the offense of which he is charged.  See Article 51(c), UCMJ, 10 USC § 851(c), and United States v. Glover, 50 MJ 476 (1999); United States v. Brown, 50 MJ at 265; United States v. Mance, 26 MJ 244, 254 (CMA 1988) (duty of military judge to instruct members on all elements of the offense).  See also United States v. Gaudin, 515 U.S. 506; see generally Weiss v. United States, 510 U.S. at 177-78 (recognizing Fifth Amendment due process standard for measuring court-martial procedures).

**V**
**Appellant's Trial**

Appellant was charged and found guilty of failure to obey a lawful order in violation of Article 92(2), UCMJ.  The specification he was found guilty of states:

> SPECIFICATION:  In that Specialist Michael
> G. New, US Army, having knowledge of a
> lawful order issued by LTC Stephen R.
> Layfield on 2 OCT 95 and CPT Roger H.
> Palmateer on 4 OCT 95, to wear the
> prescribed uniform for the deployment to
> Macedonia, i.e., U.N. patches and cap, an

>           order which it was his duty to obey, did,
>           at or near Schweinfurt, Germany, on or
>           about 10 OCT 95, <u>fail to obey the same</u>.

(Emphasis added.)

In a pretrial session under Article 39(a), UCMJ, 10 USC §
839(a), the military judge addressed a series of government and
defense motions, including motions to dismiss which he denied.
Then, the judge held as a matter of law that the uniform order
given to appellant was lawful and that the members of the jury
would be so instructed with regard to their deliberations on his
guilt of disobeying that order. (R. 285, 376)  Defense counsel
strongly objected to both these rulings. (R. 423-433, 448-49)

Appellant had raised several claims that the order to attach
UN accoutrements (<u>i.e.</u>, patches and cap) to his U.S. Army uniform
was unlawful.  As noted earlier, these arguments pertain to the
legality of appellant's deployment and are not justiciable issues
under our case law.  See <u>United States v. Johnson</u>, 17 USCMA 246,
38 CMR 44 (1967).  I agree with Judge Effron and Senior Judge
Everett that appellant's claims that the order was illegal on
these bases were properly rejected by the judge as a matter of
law ("political-question doctrine").  See <u>United States v.
Johnson</u>, <u>supra</u>.

A remaining argument, however, that the defense asserted at
trial was that the order in question, <u>i.e.</u>, to wear the UN
patches and cap, violated a Department of the Army Regulation,

<u>i.e.</u>, Army Regulation (AR) 670-1, <u>Wear and Appearance of Army Uniforms and Insignia</u> (1 September 1992).  It pointed to paragraph 3-4, which stated:

> Insignia and accouterments authorized for wear with these uniforms are * * * (k) <u>Foreign badges</u>, distinctive unit insignia, and regiment distinctive insignia <u>will not be worn on these uniforms</u>.

(Emphasis added.)

Both the military judge and the Court of Criminal Appeals found that this regulation did not invalidate the disobeyed order in this case because paragraphs 1-18 and 2-6d of the same regulation permitted these uniform additions.

Paragraph 1-18 provides:

> **Wearing of organizational protective or reflective clothing.**
>
> <u>Commanders may require the wear of organizational protective or reflective items</u> or other occupational health or safety equipment with the uniform <u>when safety considerations make it appropriate</u>. These items will be furnished at no cost to the individual.

(Emphasis added.)

Paragraph 2-6d provides:

> The commander <u>in charge of units of maneuver</u> may prescribe the uniform to be worn <u>within the maneuver area</u>.

(Emphasis added.)

14

Both the judge at trial and the Court of Criminal Appeals found as fact that the disobeyed order was issued for "safety" purposes and while on "maneuver." (R. 426, 428) (R. 443-44 & 449)

The military judge then made a ruling that the order given to appellant was a lawful order. See R. 431. Later, prior to trial counsel's and defense counsel's arguments on findings, the military judge gave the members the following instructions on findings:

> In order to find the accused guilty of this [disobedience] offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements: One, that a member of the armed forces, namely, Lieutenant Colonel Stephen R. Layfield, on 2 October 1995; and Captain Roger H. Palmateer, on 4 October 1995, issued a certain lawful order to wear the prescribed uniform for the deployment to Macedonia, i.e., UN patches and cap;
>
> * * *
>
> Members of the court, as a matter of law, the order in this case, as described in the specification--if, in fact, there was such an order--was a lawful order.
>
> * * *
>
> You should consider, along with all the evidence in this case, the following: I previously instructed you that, as a matter of law, the order in this case, as described in the specification--if, in fact, there was such an order--was a lawful order. I further instruct you at this time that, as a matter of law, the accused would not have violated AR 670-1 by obeying the order in this case as

15

> described in the specification, if, in
> fact, there was such an order.

(R. 782-84 (emphasis added)).

After the arguments on findings, the military judge again instructed the members on the findings in the following manner:

> I have judicially noticed that AR 670-1
> is a lawful regulation [and] that the
> accused had a duty to obey that
> regulation.
>
> * * *
>
> You should consider, along with all the
> evidence in this case, the following:
> I previously instructed you that, as a
> matter of law, the order in this case,
> as described in the specification--if,
> in fact, there was such an order--was a
> lawful order.  I further instruct you at
> this time that, as a matter of law, the
> accused would not have violated AR 670-1
> by obeying the order in this case, as
> described in the specification, if, in
> fact, there was such an order.

(R. 829-30 (emphasis added)).

## VI
## Lawfulness Of Order
## As Element
## Of The Offense

The first question I will particularly address is whether the lawfulness of the order allegedly violated in this case is an element of the offense of disobedience of an order under Article 92(2), UCMJ.  This criminal statute states:

> **§ 892.  Art. 92.  Failure to obey**
> **order or regulation**

16

> Any person subject to this chapter who—
>
> (1) violates or fails to obey any lawful general order or regulation;
>
> (2) <u>having knowledge of any other lawful order</u> issued by a member of the armed forces, which it is his duty to obey, <u>fails to obey the order</u>; or
>
> (3) is derelict in the performance of his duties;
>
> shall be punished as a court-martial may direct.

(Emphasis added.)

I conclude for several reasons that the lawfulness of the order allegedly violated in this case (the order to wear UN patches and cap) was an element of the charged offense and, accordingly, under Article 51(c), UCMJ, and <u>United States v. Gaudin</u>, 515 U.S. at 522-23, should have been presented to the "military jury." [4]

---

[4] The majority's citations to <u>Cox v. United States</u>, 332 U.S. 442, 453 (1947), and <u>Yakus v. United States</u>, 321 U.S. 414 (1944), do not support its contrary position in this case. In <u>Cox</u>, the legality of the classification which was alleged to have violated the applicable regulation was not an element of the charged criminal offense. In <u>Yakus</u>, Congress expressly provided that a person could be prosecuted for violating certain regulations or regulatory decisions without regard to the validity of such a regulation unless the accused previously challenged them in an appropriate civil proceeding or exhausted his administrative remedies. <u>Cf</u>. Article 96, UCMJ, 10 USC § 896 (prohibiting releasing prisoner without authority "whether or not the prisoner was committed in strict compliance with law.").

United States v. New, 99-0640/AR

First, I note that Article 92, UCMJ, as well as other codal provisions noted above, expressly prohibit failure to obey a "lawful" order, language recognizing the historical and political importance of requiring servicemembers to obey only lawful orders.  See G. Davis, A Treatise on the Military Law of the United States 378-82 (1913 3$^d$ ed. rev.); C. Clode, The Administration of Justice Under Military and Martial Law 30-31 (2nd ed. 1874); Winthrop, Military Law and Precedents 575 (2nd ed. 1920 Reprint).  See generally United States v. Gentle, 16 USCMA 437, 441, 37 CMR 57, 61 (1966); United States v. Milldebrandt, 8 USCMA 635, 639, 25 CMR 139, 143 (1958) (Quinn, C.J., concurring in the result) (American servicemembers "are neither puppets nor robots").

Second, I note that the President in the Manual for Courts-Martial, United States, has repeatedly identified the lawfulness of the order as an element of this offense. [5]  See paras. 16b(2)(a) and 16c(1)(c), Part IV, Manual for Courts-Martial, United States (1995 ed.) ("That a member of the armed forces issued a certain lawful order").  See also para. 16(b)(2)(a),

---

[5] This was a change from previous Army Manuals which did not expressly describe lawfulness as an element of the offense of disobedience of orders but simply noted commands can be presumed lawful in its explanation of the elements of this offense. Paras. 152b and 153b, Manual for Courts-Martial, U.S. Army, 1949; paras. 134b and 135b, Manual for Courts-Martial, U.S. Army, 1928; paras. 415 and 416, Manual for Courts-Martial, U.S. Army, 1917. See United States v. Trani, 1 USCMA 293, 295, 3 CMR 27, 29 (1952) (discussing Article of War (AW) 64 and paragraph 152b, Manual for Courts-Martial, U.S. Army, 1949.

18

Manual, supra (1994 ed.); para. 16a(1) and c(1)(C), Manual, supra (1984 ed.); para. 171b, Manual for Courts-Martial, United States, 1969 (Revised Edition); para. 171b, Manual for Courts-Martial, United States, 1951.

Third, this Court, in an opinion authored by then-Chief Judge Everett, unanimously stated that "[i]n a prosecution for disobedience, lawfulness of the command is an element of the offense." Unger v. Ziemniak, 27 MJ 349, 358 (1989). See Articles 90(2), 91(2), and 92(1) and (2), UCMJ; United States v. Martin, 1 USCMA 674, 676, 5 CMR 102, 104 (1952); United States v. Young, 1 MJ 433, 437 (CMA 1976). See United States v. Trani, 1 USCMA 293, 295, 3 CMR 27, 29 (1952); see also United States v. Hill, 5 CMR 665, 669 (AFBR 1953) (presumption of lawfulness in Manual is "tantamount to saying that the lawfulness of the regulation was an element of the offense").

Fourth, military law commentators over many years have consistently stated that lawfulness of an order in disobedience case is an essential element of this offense or those related thereto. See J. Snedeker, Military Justice under the Uniform Code §§ 2902-03 at 593-94, 597-99; Davis, supra at 380-81; cf. Winthrop, supra at 575-76 (suggesting it may be a statutory defense).

Finally, the majority opinion asserts that the lawfulness language in Article 92(2) is mere "surplusage" and that the

19

word "lawful" simply reinforces the nature of the order without establishing a separate and distinct element of the offense. [6] ___ MJ at (23) and n.7.  For this proposition it cites Winthrop, supra at 575, who there states:

> The word "lawful" [in AW 21] is indeed surplusage, and would have been implied from the word "command" alone, but, being used, it goes to point the conclusion affirmed by all the authorities that a command not lawful may be disobeyed, no matter from what source it proceeds.

(Most emphasis added (footnote omitted.))

This quote from the "Blackstone of Military Law" (see Reid v. Covert, 354 U.S. 1, 19 n.38 (1957) (plurality opinion)) provides relevant background for interpreting Article 92(2) and determining its essential elements.  See Staples v. United States, 511 U.S. 600, 619 (1994).  Winthrop clearly recognized that if the statutory word "lawful" is used in the disobedience context, it has meaning in terms of the type of military order whose disobedience is punishable at a court-martial.  It also shows that Congress could have enacted a statute prohibiting disobedience of orders without regard for the order's lawfulness but chose not to do so.  See Article 97, UCMJ, 10 USC § 897 ("except as provided by law"); cf. Article 95, UCMJ, 10 USC § 895

---

[6]  The majority cannot have it both ways.  If the lawfulness of an order is surplusage and implied in the element of an order, the members would still be required to decide lawfulness as part of their findings on the order element of the offense.  See para. 16b(2)(a), Part IV, Manual, supra (1995 ed.).

(arrest, custody, confinement); Article 96 ("whether or not the prisoner was committed in strict compliance with law").  Finally, his quotation clearly reflects the traditional Anglo-American view that a servicemember may not be punished at a court-martial for disobeying all orders of whatever mature issued by a competent superior authority.  In these circumstances, I disagree with my fellow Judges that Congress did not intend the lawfulness of the order violated to be an essential element of this criminal offense.  See Unger v. Ziemniak, supra at 358.

## VII
### Lawfulness of Order is
### Not an Interlocutory Question or Question
### Of Law

The Court of Criminal Appeals held that the question whether a disobeyed order was lawful in this disobedience prosecution was "an interlocutory question."  50 MJ 729, 738 (1999).  An interlocutory question, however, is generally understood to be one that "does not bear on the ultimate merits of the case."  See United States v. Ornelas, 2 USCMA at 100, 6 CMR at 100.  Moreover, we have expressly held that a question is not interlocutory where it is "concerned with disputed questions of fact regarding a matter which would bar or be a complete defense to the prosecution."  United States v. Berry, 6 USCMA 609, 613, 20 CMR 325, 329 (1956).  Since a servicemember may not legally be found guilty of violating an unlawful order (see Winthrop, supra, and Unger v. Zeimniak, supra) and questions of fact were raised

in this case concerning the lawfulness of the order, it cannot logically or legally be considered an interlocutory question within the meaning of Article 51(b).

The majority of this Court further contends the lawfulness of an order is a "question of law" which must be decided by the military judge. See United States v. Carson, 15 USCMA 407, 408, 35 CMR 379, 380 (1965).[7] We have generally held that a question of law is one where no facts are at issue and only a "legal effect" need be determined. United States v. Ware, 1 MJ 282, 284 n.4 (1976); United States v. Bielecki, 21 USCMA 450, 454, 45 CMR 224, 228 (1972); see United States v. Boehm, 17 USCMA 530, 38 CMR 328 (1968). None of those cases, however, approved judicial determinations on elements of an offense, nor has the dicta of this Court in Carson ever been reconciled with the decision of the Supreme Court in United States v. Gaudin, 515 U.S. 506. Cf. Dennis v. United States, 341 U.S. 494, 511-15 (1951) (plurality opinion) (holding that pretrial motion challenging constitutionality of criminal statute on First Amendment grounds was question of law for judge); United States v. Viefhaus, 168 F.3d 392, 396-97 (10th Cir.) (distinguishing Dennis, as not involving element of offense), cert. denied, 527 U.S. 1040

---

[7] Para. 57b, Manual for Courts-Martial, United States, 1969 (Revised Edition) (no longer in effect) did say, based on Carson, that the lawfulness of orders is "customarily" a question of law.

(1999). Moreover, there are facts at issue in this case which had to be resolved before the lawfulness of the order under the uniform regulation could be decided. See United States v. Robinson, 6 USCMA at 355, 20 CMR at 71.

The majority's position that the lawfulness of an order in a disobedience prosecution is "a question of law," not to be decided by the members, is based on language in this Court's opinion in United States v. Carson, supra at 408, 38 CMR at 380. The majority concedes this statement in Carson was dicta. ___ MJ at (13). Moreover, it recognizes that the dicta in Carson is inconsistent with subsequent pronouncements of this Court in Unger v. Zeimniak, 27 MJ 349. In addition, I note the Supreme Court in Gaudin expressly rejected the notion that members of a jury were incompetent to decide mixed questions of law and fact, the lynchpin of the Carson dicta noted above. See United States v. Gaudin, supra at 521; cf. United States v. Carson, supra at 408-09, 35 CMR at 380-81. Accordingly, Carson is not persuasive authority for holding that the lawfulness of an order in a disobedience prosecution is a question of law for the military judge.

There is another reason why I disagree with the majority's holding that lawfulness of an order in a disobedience prosecution is a question of law for the military judge under Article 51(b). Article 51(b) does not delineate what a "question of law" is for

purposes of final decision by a military judge.  Other provisions of the Uniform Code of Military Justice, however, do indicate Congress' intent in this regard.  In Article 51(c), Congress clearly recognized that members of a court-martial must decide whether the elements of an offense are proved by the Government beyond a reasonable doubt.  Moreover, in Article 39(a)(1) and (2), UCMJ, 10 USC § 839(a)(1) & (2), Congress implicitly recognized that "motions raising defenses or objections which are [not] capable of determination without trial of the issues raised by a plea of not guilty" are a "matter . . . appropriate for later consideration or decision by the members of the court."

In this codal context, it is clear that a "question of law" for purposes of Article 51(b) does not include elements of an offense which raise mixed questions of fact and law (e.g., United States v. Gaudin, supra) or pretrial motions which raise questions of fact "intermeshed with questions on the merits of a case" (United States v. Medina, 90 F.3d 459, 463-64 (11th Cir. 1996); see United States v. Grimmett, 150 F.3d 958, 962 (8th Cir. 1998)).  To the extent that dicta in Carson suggests the contrary, it should be ignored.  Accordingly, whether lawfulness of an order is an element of an offense or simply "an important issue" or an indiscrete element of the offense as suggested by the majority, it was not "a question of law" to be finally ruled on by the military judge under Article 51(b).  See also United States v. Wallace, 2 USCMA 595, 598-99, 10 CMR 93, 96-97

24

(1953)(similarly sending to jury question of knowledge of order under Article 90(2)).

In my view, Article 51(c) requires the military judge to instruct the members on the law pertaining to the elements of a charged offense.  See United States v. Brown, 50 MJ at 265.  The content of these instructions are questions of law for the military judge.  United States v. Bridges, 12 USCMA at 99-100, 30 CMR at 99-100; see generally Article 51(b), UCMJ, and 114 Cong. Rec. 29401 (1968).  The ultimate decision, however, on an element of the crime which is a mixed question of fact and law is a matter for the members' determination under Article 51(c), and Gaudin.

**VIII**
**Error Under**
**United States v. Gaudin, 515 U.S. 506 (1995)**

Having concluded that the lawfulness of the order violated is an element of the offense of disobedience of orders under Article 92(2), it is necessary to determine whether the military judge erred in withdrawing that question from the members' consideration.  The Supreme Court in Gaudin addressed a similar question where a federal district court judge refused to submit to the jury the question of the materiality of a fact contained in a false statement allegedly made in violation of 10 USC § 1001. 515 U.S. at 507.  The question before the Supreme Court was

whether the accused "was entitled to have this element of the crime determined by the jury."  515 U.S. at 509.

In Gaudin, a case remarkably similar in concept to the instant case, a real estate broker was charged with making several false material statements on different federal loan documents in violation of 18 USC § 1001.  Two counts charged him with "knowingly inflating the appraised value of the mortgaged property" and one count with falsely stating that the buyer paid some closing costs.  The prosecution offered testimony of several government officials "who explained why the requested information" on the form "was important."  The Supreme Court noted what happened next:

> At the close of the evidence, the United States District Court for the District of Montana instructed the jury that, to convict respondent, the Government was required to prove, inter alia, that the alleged false statements were material to the activities and decisions of HUD.  But, the court further instructed, "[t]he issue of materiality . . . is not submitted to you for your decision but rather is a matter for the decision of the court.  You are instructed that the statements charged in the indictment are material statements."  App. 24, 29.  The jury convicted respondent of the § 1001 charges.

515 U.S. at 508-09 (emphasis added).  The Ninth Circuit, sitting in panel and later en banc, reversed because case law required that the issue of materiality in a § 1001 prosecution be decided

by the jury.  The Supreme Court affirmed the Ninth Circuit by 9-0 vote.

The Supreme Court in Gaudin recognized the basic constitutional right of a criminal defendant "to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged."  515 U.S. at 522-23 (emphasis added).  It traced this right directly to the Fifth Amendment of the United States Constitution.  It said:

> The Fifth Amendment to the United States Constitution guarantees that no one will be deprived of liberty without "due process of law"; and the Sixth, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  We have held that these provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt Sullivan v. Louisiana, 508 U.S. 275, 277-278, 124 L.Ed. 2d 182, 113 S.Ct. 2078 (1993).  The right to have a jury make the ultimate determination of guilty has an impressive pedigree.  Blackstone described "trial by jury" as requiring that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendants] equals and neighbors . . . ." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (emphasis added).  Justice Story wrote that the "trial by jury" guaranteed by the Constitution was [**2314] "generally understood to mean . . . a trial by a jury of twelve men, impartially selected, who must unanimously concur in the guilt of the accused before a legal

27

> conviction can be had." 2 J. Story,
> Commentaries on the Constitution of the
> United States 541, n.2(4th ed. 1873)
> (emphasis added and deleted). This right
> was designed "to guard against a spirit of
> oppression and tyranny on the part of
> rulers," and "was from very early times
> insisted on by our ancestors in the parent
> country, as the great bulwark of their
> civil and political liberties." Id., at
> 540-41. See also Duncan v. Louisiana, 391
> U.S. 145, 151-154, 20 L.Ed. 2d 491,
> 88S.Ct. 1444 (1968) (tracing the history
> of trial by jury).

515 U.S. at 509-11 (most emphasis added; footnotes omitted).

In Gaudin, supra, the Supreme Court ruled against the Government's argument that "materiality" was a legal question, not a factual question, and therefore, should be decided by the trial judge alone. The majority today, however, with a familiar echo to the losing government position in Gaudin, holds that the lawfulness of an order is a "question of law" for the judge alone under Article 51(b), UCMJ.[8]

The Supreme Court, however, rejected this type of thinking in Gaudin when it said:

> Other reasoning in Sinclair, [279
> U.S. 263 (1929),] not yet repudiated, we
> repudiate now. It said that the question

---

[8] The majority's position in this case also cannot be squared with numerous decisions of this Court after Carson which hold that the question of an accused's military status (in personam jurisdiction) must also be submitted to the members if military status is an element of the offense. See United States v. McGinnis, 15 MJ 345 (1983); United States v. Marsh, 15 MJ 252 (1983); United States v. McDonagh, 14 MJ 415 (1983); United States v. Laws, 11 MJ 475, 476 (CMA 1981) (opinion of Cook, J.).

> of pertinency "may be likened to those concerning relevancy at the trial of issues in court," which "is uniformly held [to be] a question of law" for the court. 279 U.S. at 298. But how relevancy is treated for purposes of determining the admissibility of evidence says nothing about how relevancy should be treated when (like "pertinence" or "materiality") it is made an element of a criminal offense. It is commonplace for the same mixed question of law and fact to be assigned to the court for one purpose, and to the jury for another. The question of probable cause to conduct a search, for example, is resolved by the judge when it arises in the context of a motion to suppress evidence obtained in the search; but by the jury when it is one of the elements of the crime of depriving a person of constitutional rights under color of law, see 18 USC §§ 241-42. Cf. United States v. McQueeney, 674 F.2d 109, 114 (CA1 1982); United States v. Barker, 178 U.S. App. D.C. 174, 546 F.2d 940, 947 (CADC 1976). [9]

515 U.S. at 520-21 (emphasis added).

Admittedly, this Court's opinion 35 years ago in United States v. Carson, 15 USCMA at 408, 35 CMR at 380, might be viewed as counter to Gaudin. Carson suggests in dicta that a law officer, not a court of members, must decide whether a disobeyed

---

[9] Article 51(b), UCMJ, 10 USC § 851(b), addresses the proper procedure for handling "all questions of law and all interlocutory questions arising during the proceedings . . . ." Article 51(c), however, addresses the proper procedure for handling "the elements of the offense . . . ." Avoiding a constitutional problem (see Weiss v. United States, 510 U.S. 163, 176-81 (1994)), I would construe these provisions in accordance with United States v. Gaudin, 515 U.S. 506 (1996), and recognize that "[i]t is commonplace for the same mixed question of law and fact to be assigned to the court for one purpose, and to the jury for another." Id. at 521.

order was lawful in a disobedience-of-orders case.  However, Carson was decided thirty years before Gaudin and its dicta rests largely on civilian authorities overturned or limited by the Gaudin decision.  See United States v. Ornelas, 2 USCMA at 100, 6 CMR at 100.  See also Dennis v. United States, 341 U.S. 494. Moreover, in a subsequent case, this Court more narrowly applied the Carson dicta to the particular situation where a law officer construed a regulation as inapplicable as a matter of law to the order violated.  See United States v. Phillips, 18 USCMA at 234-35, 39 CMR at 234-35.  See also United States v. Austin, 27 MJ at 230-31.

In any event, where a regulation is found applicable as a matter of law to a disobeyed order but its violation is at issue, we have held, consistent with Gaudin, that this question must be sent to the members to resolve depending on the facts and circumstances of a particular case.  See United States v. Smith, 21 USCMA 231, 235, 45 CMR 5, 9 (1972); United States v. Robinson, 6 USCMA at 356, 20 CMR at 72.  See also United States v. Carson, supra at 409, 35 CMR at 381; United States v. Gray, 6 USCMA 615, 618-20, 20 CMR 331, 334-36 (1956); United States v. Phillips, supra at 235, 39 CMR at 235; United States v. Ornelas, supra at 101, 6 CMR at 101. [10]

---

[10] The majority suggests a different practice based on dicta in United States v. Carson, 15 USCMA 407, 35 CMR 379 (1965), and its gloss of the discussion to various Rules for Court-Martial.  (___ MJ at 14-15)  I disagree for several reasons.  First, the

It must be recognized that Gaudin definitively explained a jury's responsibility to decide all the elements of a charged offense. See United States v. Swindall, 107 F.3d 831, 835 (11th Cir. 1997). Some circuits have subsequently attempted to distinguish Gaudin where the question withheld from the jury constitutes a pure question of statutory construction. See United States v. Credit, 95 F.3d 362, 364 (5th Cir. 1996), cert. denied, 519 U.S. 1138 (1997); United States v. Amparo, 68 F.3d 1222, 1225 (9th Cir. 1995). However, in appellant's case, the military judge and the Court of Criminal Appeals found as fact that appellant's unit was on maneuvers and that safety conditions arising from the deployment of appellant's unit to Macedonia warranted the wearing of the United Nations badges and

---

Military Judges' Guide (now the Benchbook) for some 30 years has expressly recognized and followed this approach. See para. 4-29, Military Judges' Guide (Dept. of the Army Pamphlet 27-9 (1969)). Second, United States v. Carson, 15 USCMA 407, 35 CMR 379 (1965), and paragraph 57b, Manual for Courts-Martial, United States, 1969 (Revised Edition), cited by the majority, actually recognized and approved the Ornelas procedure. Third, although the President promulgated paragraph 57b, 1969 Manual, supra, this provision did not exist prior to 1969 and was omitted in the binding provisions of all versions of the Manual starting in 1984. Fourth, the Manual for Courts-Martial makes it quite clear that the Discussion [see ___ MJ at (14)] is not an enforceable part of the Manual. Para. 4, Discussion, Part I, Preamble. Finally, the Discussion of RCM 801(e)(5) only provides that the legality of orders may be questions of fact; it does not say who decides these questions of fact. Accordingly, this is not a case asking whether a certain longstanding military procedure is constitutional as presented in Weiss v. United States, 510 U.S. at 176-81, but instead is a case where this appellate court institutes a new military procedure inconsistent with that longstanding practice; see United States v. Scheffer, 523 U.S. 303 (1998).

31

accoutrements.  Accordingly, the post-Gaudin decisions on
elements raising pure questions of law are not relevant here.

Even if the trial judge correctly decided appellant's
challenge based on AR 670-1 as a pure question of law, error
under Gaudin still occurred in this case. [11]  The military judge
might have concluded that appellant's regulatory challenge was
not applicable to the order disobeyed in this case (see United
States v. Phillips, supra) or that the regulation conferred no
right on appellant to disobey his commander's order (see United
States v. Hangsleben, 8 USCMA 320, 322-23, 24 CMR 130, 132-33
(1957)).  Nevertheless, he was still required to instruct the
members that they must determine the lawfulness of the violated
order in this case in general without regard to appellant's
legally rejected claims of unlawfulness (i.e., the general-
inference-of-lawfulness question).  See Article 51(c) and paras.
14 and 16, Part IV, Manual, supra (1995 ed.).  Error under Gaudin
occurred on this basis as well.

---

[11] Appellant's additional arguments are that the UN-patches-and-
cap order violated the constitutional prohibition against
involuntary servitude (Amend. XIII), the UN Participation Act,
and his enlistment contract.  These arguments pertain to the
legality of his unit's deployment order to Macedonia as part of
the UN Peacekeeping Force, not the legality of the order to wear
the UN accoutrements in Germany prior to that deployment.  See
United States v. Lenox, 21 USCMA 314, 45 CMR 88 (1972).

**IX**
**Harmless Error under**
**Neder v. United States,**
**527 U.S. 1 (1999)**

Having concluded that the military judge erred in removing the question of the lawfulness of order allegedly violated in this case from the members' consideration, a question of prejudice remains. See Neder v. United States, supra at 4. In Neder, the Supreme Court held that a federal district court's refusal to submit the materiality element of offenses under the federal tax, mail, wire, and bank-fraud statutes was subject to harmless-error analysis. Id. at 4. It further held such error as to the tax fraud was harmless in Neder's case because based on the whole record it concluded "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 15.

The Supreme Court in Neder clearly delineated the harmless-error inquiry required for the type of error we have in the instant case, as follows:

> We believe that where an omitted element is supported by uncontroverted evidence, this approach reaches an appropriate balance between "society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made." Connecticut v. Johnson, 460 U.S., at 86 (plurality opinion). The harmless-error doctrine, we have said, "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's

> guilt or innocence, . . . . and promotes public respect for the criminal process by focusing on the underlying fairness of the trial." Van Arsdall, supra, at 681. At the same time, we have recognized that trial by jury in serious criminal cases "was designed 'to guard against a spirit of oppression and tyranny on the part of rulers,' and 'was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties.'" Gaudin, 515 U.S., at 510-511 (quoting 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873)). In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.
>
> Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error -- for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding -- it should not find the error harmless.

527 U.S. at 18-19 (emphasis added).

Turning to the present case, the Government was required to prove to the members the essential elements of the offense of disobedience of orders, including the lawfulness of the order to wear the UN patches and cap. See United States v. Gaudin, 515 U.S. 506, and Article 51(c), UCMJ. In this regard, it normally

34

would be entitled to rely on an inference of lawfulness provided by the President in paragraph 14c(2)(a)(i), Part IV, 1984 Manual, supra (1995 ed.).  However, the defense evidenced paragraph 3-4(k), AR 670-1 (1 Sept. 1992), and paragraph 113, Part IV, Manual, supra (1995 ed.) (wearing unauthorized insignia as offense under Article 134).  The former provided that "[f]oreign badges, distinctive unit insignia and regiment distinctive insignia will not be worn on these uniforms [BDUs]."  The latter prohibited the unauthorized wearing of "insignia, decoration, badge, ribbon, device, or lapel button upon the accused's uniform," in violation of Article 134.

This is some evidence that appellant's order to wear UN badges was "patently illegal" because it "direct[ed] the commission of a crime."  Para. 14c(2)(a)(i), Manual, supra (1995 ed.); see Article 92(1) (Disobedience of a Lawful General Regulation).  See also United States v. White, 17 USCMA 211, 214, 38 CMR 9, 12 (1967) (evidence of violated regulation sufficient to offset presumption confinement lawful); cf. United States v. Wartsbaugh, 21 USCMA 535, 540, 45 CMR 309, 314 (1972) (where no evidence order violated regulation, defense evidence insufficient to rebut presumption of lawfulness of order).  In these circumstances, the Manual for Courts-Martial generally provides that the Government must prove the lawfulness of the disobeyed order without benefit of the inference of lawfulness, and it was required to affirmatively show that the order did not violate

paragraph 3-4(k), AR 670-1; see United States v. Wartsbaugh,
supra.    As noted above, paragraph 1-18 permits a commander to
"require the wearing of organizational protective or reflective
items or other occupational health or safety equipment with the
uniform when safety considerations make it appropriate."
(Emphasis added.)  Moreover, paragraph 2-6d provides that "[t]he
commander in charge of units on maneuver may prescribe the
uniform to be worn within the maneuver area."  (Emphasis added.)
Accordingly, the prosecution could easily meet its burden by
proving as fact to the members that the wearing of the UN badges
and cap was otherwise authorized by an authority superior to that
issuing the U.S. Army Uniform Regulation (Department of the Army)
or that the above-cited sections of the uniform regulation
authorized the wearing of the UN accoutrements.

As noted earlier in this opinion, it was uncontroverted in
appellant's case that he was ordered to wear the UN badges and
cap pertinent to the official deployment of his unit to Macedonia
as part of a peacekeeping mission. (R. 581)  Its mission was "to
observe, monitor, and report along the Macedonian and Serbian
border." (R. 581)  It was also uncontroverted that the order to
wear these badges was given by his commanders as part of the
operations plans for the mission and for safety purposes. (R.
710; 667).  Finally, although the defense asserted that there
were questions of fact to decide in this case, it proffered no
evidence that the safety conditions in Macedonia did not make the

wearing of these badges appropriate or that this deployment was not a maneuver within the meaning of AR 670-1.  See United States v. Wartsbaugh, supra at 540, 45 CMR at 314; United States v. Smith, 21 USCMA at 234-35, 45 CMR at 8-9.  Accordingly, there was no real contest in this case on the lawfulness of this order in terms of this regulation, and appellant was not prejudiced by the failure of the military judge to instruct on this element of the offense.  See also Johnson v. United States, 520 U.S. at 470.

## X
## Conclusion

In sum, I conclude that the military judge erred in withdrawing from the members' consideration an element of the charged offense of disobedience of orders, i.e., the lawfulness of the order disobeyed.  See generally United States v. Gaudin, supra.  See Unger v. Ziemnick, 27 MJ at 358; United States v. Robinson, 6 USCMA 347, 20 CMR 63.  However, this error in my view was harmless beyond a reasonable doubt in this case.  See  Neder v. United States, supra. There was overwhelming evidence presented in this case, uncontroverted by the defense, that the order to wear the UN patches and cap was lawful, i.e., it was properly authorized, related to a military duty, and violated no applicable service uniform regulations.  See generally para. 16c(1)(a) and (c), Part IV, Manual, supra (1995 ed.).  Accordingly, I join my colleagues in affirming appellant's conviction in this case.

In reaching this legal decision, I am not unmindful of the concept of military duty. When one takes a broad view of the factual context and circumstances of the order Specialist New was given, it is clear that he had a duty to obey it. Specialist New was being sent in harm's way at the command of his Nation. The wearing of UN insignia and headgear would only help him and his fellow soldiers to more safely perform their peacekeeping mission to Macedonia. New had a duty to his unit---a duty to help his unit accomplish its mission with the least risk of loss of life. I am reminded of a passage of Justice Oliver Wendell Holmes, Jr., in an address to the Harvard Graduating Class of 1895. The speech was entitled, "The Soldier's Faith," and it clearly reflected the views of a Judge who in his youth had seen war as a soldier:

> [I]n the midst of doubt, in the collapse
> of creeds, there is one thing I do not
> doubt . . . and that is that the faith is
> true and adorable which leads a soldier to
> throw away his life in obedience to a
> blindly accepted duty, in a cause which he
> little understands, in a plan of campaign
> of which he has little notion, under
> tactics of which he does not see the use.
>
> "The Soldier's Faith," May 30, 1895, in
> Holmes, Speeches 56,59 (1913).

Although I have found legal error in this case, I find that the error in the context of this case was harmless beyond a reasonable doubt, and I see no reason to reverse this case. See

also Article 59(a), UCMJ, 10 USC § 859(a).  As the renowned

English Judge, Sir John Powell, so wisely said a long time ago:

> Let us consider the reason of the case.
> For nothing is law that is not reason. 3/

_____

3/  Coggs v. Bernard, 2 Lord Raymond
Reports 909, 911 (1703).

EVERETT, Senior Judge (concurring in part and concurring in the result):

I concur fully with the principal opinion that the defense challenge for cause was properly denied.

In deciding whether an issue as to lawfulness of the order should have been submitted by the military judge to the court-martial members, my starting point is the Uniform Code of Military Justice's provision that in a general or special court-martial the military judge "shall rule upon all questions of law and all interlocutory questions arising during the proceedings." See Article 51(b), 10 USC § 851(b). An "interlocutory question" may involve fact, law, or both. For example, if the question concerns admissibility of a confession made while the accused was a suspect, the judge will decide any factual dispute as to whether the accused was a suspect at the time of the statement and whether a warning was given pursuant to Article 31(b), UCMJ, 10 USC § 831(b). If the dispute is not whether certain language was spoken by way of warning but whether the language sufficed to meet the requirements of Article 31(b), the judge will decide this issue of law in determining the "interlocutory question" of admissibility. Finally, if the dispute concerns not only the fact of whether any warning was given but also whether the language used was sufficient to satisfy Article 31(b), the judge must determine the facts and may then confront a question of law in deciding the "interlocutory question." See generally United States v. Miller, 31 MJ 247 (CMA 1990).

Likewise, if the defense by motion to dismiss raises an issue of sufficiency of the evidence, the military judge will decide as an "interlocutory question" whether, if all the prosecution evidence is believed by the court-martial members, they could reasonably find the accused guilty

beyond a reasonable doubt.  However, when the ultimate
question of guilt or innocence is submitted to the court-
martial members, the military judge must refrain from
deciding any issue of fact; and if he does make such a
decision, he has erred.  On the other hand, the military
judge must instruct the court-martial members as to matters
of law; and, in so doing, he may have to decide a "question
of law."  That "question of law" is not to be presented to
the court-martial for second-guessing on their part.

In my view the roles of the military judge and the
court-martial members correspond to those of judge and jury
in federal criminal trials.  This result -- although
probably not constitutionally required -- was intended by
Congress when the Uniform Code of Military Justice was
enacted a half century ago.  When Congress later passed the
Military Justice Act of 1968 and changed the "law officer"
title to "military judge," it made this intent even clearer.
Accordingly, I conclude that precedents like United States
v. Gaudin, 515 U.S. 506 (1995) -- which apply to trials in a
federal district court -- apply equally to courts-martial.
Therefore, in a fraud case tried in a court-martial, the
members would have the same responsibility to decide whether
the accused's statements were "material" that civilian
jurors would have if the case were tried in a federal
district court; and the trial judge -- whether a federal
district judge or a military judge -- should give the same
instructions as to materiality.  Failure to give such
instructions in a trial by court-martial should carry the
same consequences as would the same failure of a federal
district judge in a criminal trial.

New was convicted of disobeying an order in violation
of Article 92(2), UCMJ, 10 USC § 892(2).  The explicit

2

language of Article 92(2) states that conviction requires a "lawful order", cf. Art. 92, 10 USC § 992.  However, even without this language, the requirement of lawfulness of the order would be implied.  According to appellant, that requirement was not complied with and -- at the very least -- the court-martial members should have been instructed thereon. The analogy drawn is to the reversible failure to instruct on materiality in Gaudin.

In Gaudin, a consideration of facts was necessary to decide materiality, but in the case at bar, the facts on which appellant chiefly relies to raise an issue as to lawfulness are not even admissible in determining New's guilt or innocence.  Appellant's defense that the order given him was not lawful rests largely on the premise that the order was given incident to a military operation that was beyond the constitutional authority of the President and Congress.  In my view, the doctrine of "political question" precluded the court-martial -- whether the military judge or the court members -- from considering evidence as to this defense. According to this doctrine, certain issues are non-justiciable because their decision by a court would unduly hamper the Executive and Legislative Branches and violate separation-of-powers theory.  Cf. Harisiades v. Shaughnessy, 342 U.S. 580, 589(1952).  The constitutionality of the military operation to which appellant was assigned presents a "political question" not suitable for a court-martial or a district court to decide.  Moreover, I am unsure that, for purposes of standing, New had a sufficient individualized interest to contest in a court-martial for disobedience the constitutionality of the military operation to which he was assigned.  Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208 (1974).  Since appellant's contention as

to unlawfulness of the order sought to present an issue that could not properly be considered by the court-martial, it required no instruction by the military judge to the court-martial members -- just as no jury instruction as to lawfulness of the order would have been required if lawfulness of the order had been at issue in a federal criminal trial.

In other contexts an entirely different approach may be required.  For example, if no political question exists and the accused has standing to raise a pure question of law, the military judge will need to decide that question but will have no reason to submit that question to the court-martial members.  For example, if the question is whether an order was given pursuant to a statute which violated the Constitution, this "question of law" will be decided by the military judge without instructing the members to consider the constitutionality of the statute.  Such a question is quite unlike the issue of materiality in the Gaudin case, as to which the Supreme Court held that the trial judge should have instructed the jurors.

On the other hand, in Unger v. Ziemniak, 27 MJ 439 (CMA 1989), the Court recognized that as to disobedience of an order there may be not only a legal issue for final determination by the military judge, but also a factual issue to be decided by the court-martial members under proper instructions.  The question of law for the judge concerned whether, under any circumstances, an officer could be ordered to provide a urine specimen to an enlisted person to be tested for drugs.  The factual determination –- to be made by the court-martial members -– concerned whether the order given the accused had required that her urine specimen

4

be provided under degrading and humiliating conditions.*
Id. at 359.

I can conceive of other situations in which the issue of lawfulness of an order should be submitted to the court-martial members under proper instructions.  For example, if an order was lawful only if it called for performance within a specific geographic area and during a specific time period, the court-martial members must decide the facts as to that time and place.  What if the questioned order was given by company commander Captain David to his subordinate, Sergeant Uriah, who disobeyed it because he believed that David was trying to get him killed and steal his wife Bathsheba?  2 Samuel 11 and 12.  In that case, the intent of David might present a question of fact to be determined by the court-martial members under proper instructions.

In addition to relying on the alleged unconstitutionality of the military operation in which appellant New was ordered to deploy, the defense also claims that a factual question was raised as to the existence of safety considerations for the orders.  If a question of fact as to safety considerations was raised by the evidence concerning lawfulness of the contested order, this question would be for the court-martial members to decide under proper instructions.  However, even a failure to instruct on an element of an offense is subject to harmless error analysis under some circumstances.  Cf. Neder v. United States, 527 U.S. 1 (1999).  In this case, I conclude that if there was any question of fact as to whether the order to

---

* This is a situation like those referred to in the current Manual's Discussion accompanying RCM 801(e)(5) quoted in Chief Judge Crawford's opinion when it states that "[i]t is possible, however, for such questions to be decided solely upon some factual issue, in which case they would be questions of fact . . . ."

5

wear battle dress insignia promoted safety, it was so insubstantial that the judge's failure to instruct thereon was not reversible error.

Since I conclude that, if the military judge erred at all, the error was not prejudicial to New, I concur in affirming the decision below.